**Andrea F. deMARS, Plaintiff-Appellee,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Defendant-Appellant.**

**No. 79–1100.**

United States Court of Appeals, First Circuit.

Argued Sept. 7, 1979.

Decided Dec. 11, 1979.

Charles F. Barrett, Boston, Mass., with whom Werner Weinstock, Joseph G. Williams, Jr., New York City, Brian T. Kenner and Nutter, McClennen & Fish, Boston, Mass., were on brief, for defendant-appellant.

Neal C. Tully, Boston, Mass., with whom Thomas E. Cargill, Jr., and Cargill & Masterman, Boston, Mass., were on brief, for plaintiff-appellee.

Before COFFIN, Chief Judge, KUNZIG,[*] Judge, U.S. Court of Claims, BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

This diversity case arose out of the refusal of defendant-appellant, The Equitable Life Assurance Society of the United States, to pay plaintiff-appellee, Andrea F. deMars, widow of the insured decedent, John O. deMars, benefits claimed under the accidental death provisions of a group life insurance policy. The following issues are raised on this appeal from a jury verdict in favor of appellee.

1. Is there sufficient evidence to uphold the verdict.

2. Was it reversible error to allow portions of a letter written by a deceased physician to be read to the jury.

3. Did plaintiff-appellee meet the proof of loss requirements of the policy.

4. Should a new trial have been granted.

*The Facts*

The case has an unusual setting. The insured had suffered for a number of years prior to his death from chronic obstructive lung disease with bronchitis, bronchiectasis, bronchial asthma, and emphysema. Although deMars started having serious breathing problems in August of 1967, he continued to lead an active and even vigorous life. His work at Raytheon required extensive travelling between 1967 and 1969, which he was able to do. deMars and his wife had seven children and he and his family engaged in strenuous outdoor recreational activities, including camping and skiing. In May of 1971, deMars suffered a severe respiratory problem and nearly died. He underwent a tracheotomy and was hospitalized for six weeks. It was determined that, in order to live, deMars would need a continuous oxygen supply. When he was discharged from the hospital, he was fitted with a portable oxygen tank, which he wore at all times, that had a tube running from it into one of his nostrils so he would be inhaling oxygen continuously. Arrangements were made for storing oxygen tanks at his home and office so the portable tank could be replenished whenever necessary.

Despite this handicap, deMars continued to live as normal a life as possible. He returned to work after the hospitalization and was soon back on a full schedule. He and his family took a fall foliage trip to Vermont, and he went skiing at least twice during the winter of 1971–1972.

* Sitting by designation.

The accident leading to deMars' death occurred on March 11, 1972, when he was skiing. deMars and his family had gone to Waterville Valley, New Hampshire, for a day of skiing. He and his family skied all morning. Early in the afternoon, deMars fell while coming down one of the slopes and broke his left hip. After preliminary treatment at Plymouth Hospital in New Hampshire, he was taken to University Hospital in Boston where he was put in traction and immobilized. He died on April 6. Although the death certificate stated the immediate cause of death as "possible pulmonary embolism due to Phlebitis deep," the subsequent autopsy established that there was no pulmonary embolism.

The pertinent provision of the insurance policy provides:

"Upon receipt of due proof that any employee, while insured under this policy, shall have sustained bodily injuries caused directly and exclusively by external, violent and purely accidental means, and, within ninety days after such injuries, and as a result, directly and independently of all other causes, of such injuries, shall have sustained any of the losses enumerated in the Schedule of Losses set forth below [including life], the Society will, subject to the limitations and provisions of this policy, pay to such employee, if living, otherwise to the beneficiary, an amount determined in accordance with said schedule."

The policy also has the following "limitations" provision:

"No payment shall be made under this policy for any loss resulting from or caused directly or indirectly, wholly or partly, by

"(a) bodily or mental infirmity, hernia, ptomaines bacterial infections (except infections caused by pyogenic organisms which shall occur with and through an accidental cut or wound) or disease or illness of any kind . . .."

The determination of the cause of death was, of course, the main issue in the case. Plaintiff contended that her husband's death was caused by the ski accident. Defendant's position was that the insured's chronic obstructive lung disease was the principal and underlying cause of his death.

1. *The Sufficiency of the Evidence*

The standard of review that applies to a refusal to direct a verdict in favor of a defendant is well established. A verdict should be directed only where the evidence could lead reasonable men to but one conclusion. This determination is to be made without evaluating the credibility of the witness or considering the weight of the evidence. *Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir. 1974). The same review standard applies to a refusal to grant a motion for judgment n. o. v. The evidence and any reasonable inferences therefrom are to be reviewed in the light most favorable to the nonmoving party. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 989 (1st Cir. 1978).

Plaintiff had the burden of convincing the jury by a preponderance of the evidence that the cause of death met the policy terms, that decedent "sustained bodily injuries caused directly and exclusively by external, violent and purely accidental means," and died "within ninety days after such injuries, and as a result directly and independently of all other causes of such injuries."

The evidence adduced on behalf of plaintiff was mainly the testimony of Dr. Herbert Sise, decedent's family physician who treated him from August, 1967, until his death. The pertinent testimony of Dr. Sise can be capsulized as follows. He described the condition and treatment of deMars prior to his near fatal hospitalization in May of 1971 as a result of a massive respiratory failure. Dr. Sise stated that decedent, after being put on a continuous oxygen supply in June of 1971, "improved on this program really beyond everybody's belief." Dr. Sise did not see deMars between July 31, 1971, and the date of the skiing accident on March 11, 1972. Dr. Sise saw decedent every day from the accident until his death. Precautions were taken and special medi-

cation used because of deMars' respiratory problems. Steroids, which were being given him because of his asthma, were eliminated since they interfered with the healing of the fractured bone. Four days prior to death, "[h]e really was getting along quite well, really beyond my expectations." Dr. Sise saw deMars late in the afternoon of the day he died, "and he appeared to be unchanged."

In April of 1972, Dr. Sise wrote to one Andrew Lane (presumably either an employee of Raytheon or Equitable) stating, "In summary it is my opinion that Mr. deMars died of acute respiratory failure which was precipitated by the necessity to withdraw steroids as a result of his fracture." At the trial, Dr. Sise changed his opinion as to the cause of death and attributed it to cardiopulmonary arrest. He testified, "My opinion is that with reasonable medical certainty this [deMars' death] was the result of the accident independently of the other conditions." He stated further:

Anybody can have an arrest after a fracture and an operation. We all unfortunately experience this. And this man had gotten through his operation. He was coasting along in very satisfactory condition. We were quite proud of him.

Since an episode such as this, an arrest, can occur independently in persons who don't have any pulmonary disease or other form of heart disease, I can't say that the pulmonary disease contributed.

Dr. Sise was, as to be expected, subjected to intensive and extensive cross-examination by a highly skilled defense attorney. As pointed out by appellant, he did equivocate, and one interpretation of the second paragraph of the above quote is that he could not rule out the possibility that death resulted solely from the accident and its complications. However, while the doctor may have equivocated, he did not recant. The court, during a direct examination that was peppered with objections, interrupted to ask:

What do you mean when you say that you cannot say one way or the other whether or not the lung disease contributed to his death?

The answer was:

As I was saying, my opinion is based on reviewing his records, the experience I had with him and the finding that in the first place, his lung disease was not as irreversible as perhaps I thought it was at one time. Secondly, that if he was going to get into trouble, he would have gotten into trouble in the early part of his postoperative course when most of the lung patients get into trouble. The third place, I didn't realize he had died so suddenly. So, from the records this is clearly the case. And that's an arrest.

Now, on the basis of that, an arrest can happen to anybody and after an operation such as this. And I think there is a reasonable certainty that this could have happened independently of his lung disease, and that's all I'm trying to say.

On cross-examination, Dr. Sise was pressed as to this answer.

You want to change the words that you used in answer to his Honor's question where you said it could have happened independent of the underlying lung disease to, in fact, it did happen independent of his underlying lung condition, is that right?

The answer to this was a short unequivocal "Yes."

Mrs. deMars testified that, during the fall and winter preceding the ski accident, her husband was "very energetic and rugged." They took a fall foliage trip to Vermont, which included walks in the woods. The family went on two ski trips preceding the one in which decedent broke his hip. She testified that her husband finished a den in their home that fall. On the day of the accident, according to Mrs. deMars, her husband had no complaints about his health. Mrs. deMars visited her husband every day in the hospital. His main difficulty was the pain and discomfort due to the fact that he was in traction and immobilized.

Defendant introduced the testimony of three doctors: Dr. Ronald A. DeLellis, a pathologist; Dr. Edward Gaensler, a spe-

cialist in lung disease; and Dr. Howard Christian, a pathologist. All three testified that the cause of death was chronic obstructive lung disease.

In assessing the evidence within the confines of the appellate standard of review, we cannot say that only one conclusion could be reached. The question of credibility is one for the trier of fact. The change of opinion by Dr. Sise as to the cause of death is a factor bearing on credibility, but it does not, as appellant suggests, nullify the doctor's trial testimony. Viewing the evidence, as we must, in the light most favorable to the plaintiff, we hold that the district court did not err in denying the

motions for a directed verdict and judgment n. o. v.

### 2. *The Rattigan Letter*

■ After much deliberation and soul searching, the district court, relying on Rule of Evidence 804(b)(5), allowed plaintiff's attorney to read to the jury a portion of a letter from a deceased physician giving his opinion as to the cause of death. The entire letter is set forth in the margin.[1] The court ruled that the last two paragraphs could not be read to the jury.

The events leading to the admission of the letter are a necessary frame of refer-

---

1. JOHN P. RATTIGAN, M.D., F.A.C.P.
40 Court Street
Boston, Massachusetts 02108
(617) 723–6750
December 19, 1972
Thomas E. Cargill, Jr., Esquire
225 Franklin Street
Boston, Massachusetts
RE: John O. deMars (dec'd)
Dear Mr. Cargill:
I have read, with interest, your file in the above case which includes portions of the University Hospital Record covering this patient's admission from May 2 through June 14, 1971 and March 11 through April 6, 1972 on which day he expired and a copy of the Certificate of Death together with a report of the postmortem examination performed on April 6, 1972. In connection with this review, I wish to express the following observations and opinion.
Despite the fact that the Certificate of Death signed by Dr. Thomas Rossi of the University Hospital sets forth the cause of death here as "possible pulmonary embolism due to phlebitis, deep" the findings at autopsy clearly excludes the diagnosis of pulmonary embolism and establishes the probable cause of death as acute respiratory failure. For this reason the clinical course of the patient's chronic pulmonary disease with particular reference to the status of his pulmonary condition before and after the skiing accident becomes of great importance to the issue of accidental death here.
A review of the available medical data indicates that this decedent had a long history of bronchial asthma, had been under treatment for this condition for many years and was receiving substantial amounts of steroid medication and bronchodilator medication; that in June of 1969 there was evidence of right ventricular hypertrophy and polycythemia secondary to the chronic bronchopulmonary disease. There is further evidence that on May 2, 1971 he had a bout of severe respiratory failure secondary to chronic obstructive lung disease

requiring a tracheostomy. Despite this history it is apparent that at the time of the skiing accident of March 11, 1972, which resulted in a comminuted fracture of the left femur, the decedent was able to carry on the normal professional functions and was active socially and engaged in outdoor physical activity. Following the accident, there were complications of bony union resulting in failure of open reduction surgery. The problem in bone healing was undoubtedly related to the long-time history of steroid medication. It also must be taken into consideration that the treatment for the fractured femur required almost complete immobilization of the patient which can be assumed to have contributed to impairment of pulmonary ventilation. I am of the opinion that these factors superimposed upon his history of chronic obstructive lung disease led to increasing clinical manifestations of respiratory distress and ultimately to acute respiratory failure.

\* \* \* \* \* \*

There is, of course, no question that the accidental fracture of the femur and the treatment necessitated by the accident had an adverse effect upon the chronic obstructive pulmonary disease to the point that it can be stated that but for the accident Mr. deMars would not have died on April 6, 1972.
In regard to the language of the Accidental Death Benefit Policy to the effect that the bodily injury shall have caused death "directly and independently of all other causes" I would make the observation that hip fractures commonly result in death but most often, except for the occasional case of massive fat embolus to the lungs from the site of the fracture, death is the result of complicating conditions arising directly from the fracture.
Sincerely yours,
(s) John P. Rattigan
John P. Rattigan, M.D.
JPR:kd

ence for an analysis of this evidentiary issue. Dr. Rattigan was retained by plaintiff's counsel prior to trial to render an opinion as to the cause of death, which he did on December 19, 1972. Sometime thereafter and prior to trial, Dr. Rattigan died. His report was made available to defendant during discovery procedure on June 15, 1976, well in advance of trial. At the start of the trial, defendant moved *in limine* to have the letter excluded from evidence. The motion was granted "without prejudice." During the cross-examination of one of defendant's experts, Dr. Christian, plaintiff's counsel brought out that defendant had furnished Dr. Christian the Rattigan letter as part of the material to be examined preparatory to giving his opinion as to the cause of death. Plaintiff's counsel then attempted to introduce the letter, or at least cross-examine Dr. Christian as to its contents, pursuant to Federal Rule of Evidence 703.[2] The court refused to allow the letter in evidence at this time, although indicating that Federal Rule of Evidence 804 might apply.[3] After the cross-examination of Dr. Christian was completed, the court had second thoughts about the Rattigan letter and held a bench conference to further discuss its admissibility. He then ruled that, except for the last two paragraphs, the letter could be read to the jury.

Although not explicitly so stating, the statements of the court during the three bench conferences on this issue make it clear that it based its ruling on Federal Rule of Evidence 804(b)(5) which provides:

> (5) Other exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more

probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

We have read the appendix record of the bench conferences carefully to determine if the requirements of the rule were met. The court specifically found that the letter was trustworthy:

> THE COURT: All I want to do is get this thing to the jury in the best possible fashion. That means to me that I just want them to get the most reliable trustworthy evidence. Advisory Committee's notes seem to say that it's reliable. It's in this report. There is no reason to suspect that Doctor Rattigan lied or was in any way motivated to testify out of interest, but I don't think I could tell the jury that they can't accept Doctor Rattigan's statements there as the truth of the matter.

There can be no doubt that the letter was offered as evidence of a material fact as required under part (A) of the rule.

The trial court made it clear that it thought the interests of justice, part (C) of the rule, required that the letter be read to the jury.

---

2. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

3. Neither the court nor counsel adverted to Fed.R.Evid. 705, which provides: "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. *The expert may in any event be required to disclose the underlying facts or data on cross-examination*" (emphasis added).

The rule's requirement of notice was met: defendant obtained a copy of the letter during discovery, it furnished a copy to Dr. Christian for use in preparing his opinion as to the cause of death, and it brought a motion *in limine* to exclude the letter.

Neither the court nor the parties addressed directly part (B) of the rule, although defendant did assert that plaintiff had plenty of time prior to trial to obtain the services of another expert after Dr. Rattigan died. Plaintiff offered no evidence or explanation as to why another expert was not obtained and the record is silent as to the date of Dr. Rattigan's death. Since Dr. Rattigan's opinion was based solely on his examination of the decedent's medical and hospital records, the death certificate and the report of the postmortem examination any other physician could have been obtained to render an opinion on fairly short notice. This is not a situation where the treating physician suddenly dies just prior to trial. The following comment in Weinstein's Evidence on the identical provision in Federal Rule of Evidence 803(24) is instructive on how part (B) is to be construed.

> The statement must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts". What is "reasonable" depends upon such matters as the importance of the evidence, the means at the command of the proponent and the amount in controversy. The good sense of the trial judge must be relied upon. It should not be necessary to scale the highest mountains of Tibet to obtain a deposition for use in a $500 damage claim arising from an accident with a postal truck. Even though the evidence may be somewhat cumulative, it may be important in evaluating other evidence and arriving at the truth so that the "more probative" requirement can not [*sic*] be interpreted with cast iron rigidity.

4 Weinstein's Evidence ¶ 803(24)[01] at 803–243 (1977). Since the trial judge never discussed this requirement, we are without the benefit of his thinking. Plaintiff, at least as far as the record shows, made no effort at all to obtain the opinion of another doctor so we do not have to determine whether a reasonable effort was made. The amount at stake here was $160,000, which normally should produce some kind of an effort to take up the slack caused by the death of an important witness.

Congress "intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." Committee on the Judiciary, S.Rep.No. 93–1277, Note to Paragraph (24), 28 U.S.C.A. Fed.R.Evid. p. 583 (1975). The requirements of part (B) of the rule cannot be ignored. *See, e. g., United States v. Kim*, 193 U.S.App.D.C. 370, 379–81, 595 F.2d 755, 764–66 (D.C. Cir. 1979) (telex excluded because, *inter alia*, it did not meet the requirements of part (B) of Rule 803(24); *United States v. Reese*, 183 U.S.App.D.C. 1 n. 18 at 10–11, 561 F.2d 894 n. 18 at 903–04 (D.C. Cir. 1977) (no claim or showing that agreement was more probative than any other evidence defendant could procure through reasonable means); *Matter of Sterling Nav. Co., Ltd.*, 444 F.Supp. 1043, 1047–48 (S.D. N.Y. 1977) (no effort made to depose or produce other witnesses); *Workman v. Cleaveland-Cliffs Iron Company*, 68 F.R.D. 562 (N.D. Ohio, E.D. 1975) (other witnesses to the accident available).

We find that the requirements of Fed.R. Evid. 804(b)(5)(B) were not complied with and, therefore, the district court erred in admitting the letter.

The next question is whether allowing portions of the letter to be read to the jury requires a new trial or whether the error was harmless. Fed.R.Civ.P. 61 provides:

### HARMLESS ERROR

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless

refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Evid. 103(a) states: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

The phrases "substantial justice" and "a substantial right" are not words of art; they call for a subjective judgment. Nevertheless, the general contours within which such judgment must be made have been mapped out. *See* 11 C. Wright & A. Miller, Fed.Prac. & Proc., Civil § 2885 at 288–90 (1973); the admission of evidence is not prejudicial if the facts have already been shown by admissible evidence, but it would be inconsistent with substantial justice if the evidence is insufficient to support the verdict without the erroneously admitted evidence. In *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 537 (5th Cir. 1974), the court found it harmless error under Fed.R.Civ.P. 61 to admit testimony that was "essentially cumulative, reinforcing the testimony of the two investigating officers and the two eye witnesses." *See also Aetna Casualty and Surety Company v. Tryniecki*, 293 F.2d 289, 291 (5th Cir. 1961), where the court held that, since the opinion testimony of a chiropractor was already before the jury in the more traditional format of opinions by medical doctors, it "was at most mere repetition" and "did not affect 'substantial justice'" under Fed.R.Civ.P. 61.

We turn now to the letter itself. Of those paragraphs read to the jury only the last sentence of the third paragraph expresses an opinion: "I am of the opinion that these factors superimposed upon his history of chronic obstructive lung disease led to increasing clinical manifestations of respiratory distress and ultimately to acute respiratory failure." This is ambivalent at best. It can be interpreted either favorably or unfavorably to plaintiff; it certainly is

not solid support for Dr. Sise's testimony. Without the penultimate paragraph, the Rattigan letter became a toothless tiger. It was cumulative, repetitious, and ambiguous. Its admission was harmless error under Fed.R.Civ.P. 61.

3. *The Proof of Loss*

 Appellant maintains that plaintiff failed to provide it with due proof of loss as required under the policy. Under the terms of the policy, plaintiff had an obligation to furnish Equitable written proof of loss within ninety days [4] after the date of death that the insured had "sustained bodily injuries caused directly and exclusively by external violent and purely accidental means" and died "within ninety days after such injuries, and as a result, directly and independently of all other causes, of such injuries."

The district court submitted to the jury the question of whether plaintiff had furnished due proof of loss to defendant. We look to Massachusetts law to determine whether this was correct or whether, as appellant contends, the proofs furnished were legally deficient. The most recent case in this area amounts to a restatement of Massachusetts law on the subject. It involved the interpretation of a similar policy requirement. In *Washington v. Metropolitan Life Ins. Co.*, 372 Mass. 714, 363 N.E.2d 683 (1977), the Supreme Judicial Court held that plaintiff had failed to furnish the insurer due proof "that the Death of the Insured occurred as a result, directly and independently of all other causes, of bodily injury caused solely by external means." *Id.* 363 N.E.2d at 685. In finding that the proof of loss was inadequate, the court stated:

> The information submitted to the insurer prior to trial was consistent with death from a heart attack. It certainly did not support a theory that an accident was the sole cause of death. Essential facts were not disclosed concerning the deceased's condition just before his death, which

4. No claim is made that the proof of loss was untimely.

would have tended to support a medical conclusion that death was caused by the blow to the deceased's head. The only medical information submitted was inconsistent with the plaintiff's theory of accidental death.

*Id.*, 363 N.E.2d at 686.

The court, quoting and citing to prior Massachusetts cases, noted the purposes for due proof of loss, *viz.*, to enable the insurer to form an intelligent estimate as to whether the death came within the terms of the policy, to prevent fraud and to enable the insurer to make an investigation to determine its rights and liabilities. The court cautioned:

> However, the requirement of due proof is not a shield behind which an insurer may hide silently in the hope that the claimant will fail to submit due proof of what is a valid claim.

*Id.*, 363 N.E.2d at 687.

In evaluating what was submitted by plaintiff, we are mindful that under *Washington v. Metropolitan Life Ins. Co.*, 386 N.E.2d at 686, testimony offered at trial is not accepted as a substitute for due proof of loss. We, therefore, focus on what was furnished or made available to Equitable within ninety days of the insured's death. Plaintiff submitted a Notice of Accidental Death form which stated that death resulted on March 11, 1972, due to a skiing accident at Waterville, New Hampshire. The Certificate of Death furnished gave the cause of death as a pulmonary embolism and listed severe asthma and severe left hip fracture as significant conditions. On Equitable's Proofs of Accidental Death form, plaintiff described the accident as "skiing accident—fracture of left hip" and listed the name and address of the attending physician. After receiving these documents, appellant sent Donald E. Wilson, one of its benefit managers, to interview plaintiff. She answered questions about the circumstances of her husband's death and executed a medical authorization giving Equitable access to the medical information it wanted, including the autopsy report. Wilson then talked to Dr. Sise. The report

Wilson filed shows that Dr. Sise explained that the autopsy proved that the insured did not die of a pulmonary embolism. It also reflects Dr. Sise's first opinion as to the cause of death. On August 31, Equitable notified the manager of personnel services at Raytheon that "neither the proofs nor the facts establish an accidental death within the terms and provisions of the policy and certificate." A similar notice was sent to plaintiff on September 15, 1972.

Appellant objects to the report of its agent Wilson and the medical information obtained through him being included as part of plaintiff's proof of loss because it was obtained by Equitable's own efforts. This puts too tight a leash on *Washington v. Metropolitan Life Ins. Co.*, 363 N.E.2d 683, in which it was explicitly stated: "If the initial proof is inconclusive but contains information reasonably suggesting that the claim may be valid, an insurer has the duty of further inquiry, at least to the extent of inviting the submission of further information in support of the claimant's position." *Id.*, 363 N.E.2d at 687. Wilson's investigation was a direct response by Equitable to a clear notice that a claim of accidental death was being made. It was plaintiff's authorization that enabled Equitable to obtain the medical information which resulted in the rejection of her claim for accidental death benefits. The district court did not err in instructing the jury that, on the question of due proof of loss, it could consider "the information or the access to information and medical reports provided as a result of the interview or meeting of Mr. Wilson of Equitable with Mrs. deMars."

The proofs of loss here are clearly of a different quality than those submitted in *Washington v. Metropolitan Life Ins. Co.* where "[t]he only medical information submitted was inconsistent with plaintiff's theory of accidental death." 363 N.E.2d at 686. Here, the medical information submitted could well be interpreted to state the cause of death to be the direct result of the ski accident. While the autopsy did eliminate the usual cause of death from hospital immobilization, pulmonary embo-

lism, the autopsy report itself could fairly be interpreted to mean, as Dr. Sise testified, that the insured died as a result of the ski accident and the consequent hospitalization. Plaintiff's proofs of loss met the purpose test of *Washington v. Metropolitan Life Ins. Co.*: the insurer was able to make an intelligent estimate as to whether the death came within the terms of the policy and it was enabled to launch a prompt investigation to determine its rights and responsibilities.

To accept appellant's interpretation of the holding of *Washington* would mean that, unless the medical information submitted stated clearly and unequivocally that the cause of death was purely accidental, the insurer would have no obligation under the policy. While this approach would eliminate law suits in cases like this, it does not comport with the realities of life and death. The practice of medicine, like the practice of law, is an art, not an exact science. In a case such as this where plaintiff's evidence depicted the insured as a person who, by the use of oxygen, was able to live an active, vigorous life and the defendant's evidence pictured him as a walking corpse, there is obviously going to be a difference of medical opinion as to the cause of death. This is the stuff out of which law suits are made. While a claimant's proof of loss must, under *Washington*, give the insured sufficient medical information on which to base a reasoned judgment, he is not required to prove the claim to the satisfaction of the insured.

There is little merit to appellant's claim that the district court should have excluded the testimony of the Raytheon employees who helped Mrs. deMars fill out and execute the proof of loss forms submitted to Equitable. It is appellant's contention that the admission of the testimony and the failure to instruct the jury that these employees were not Equitable agents allowed the jury to improperly conclude that the proofs of loss were binding on Equitable. Like the district court, we have some difficulty in following this argument.

William Fitzpatrick testified that he was manager of personnel services for Raytheon and identified the payroll records of the insured, the Proof of Accidental Death, and Notice of Accidental Death forms. He stated that the forms were supplied by Equitable and, after being executed by plaintiff, were turned over to the insurer. The benefits manager of Raytheon, Paul Foley, testified that he and Morris Nolan, industrial relations manager of Raytheon, went to see Mrs. deMars after her husband's death to explain the benefits due under the group policy. They took the Equitable forms with them and helped plaintiff fill them out. After that, the forms were forwarded to Equitable. Morris Nolan testified that, when he visited Mrs. deMars a second time to deliver a check, she asked about the accidental death benefits to which he responded, "that would be up to the insurance company."

We fail to see how this testimony was prejudicial to appellant or could be so interpreted by the jury. None of the employees made any representations—direct, indirect, or inferable—that Equitable would or had a duty to pay benefits under the accidental provisions of the policy. The only purpose of this testimony was to prove that plaintiff had submitted the necessary forms within the time limit of ninety days. The district court did not err in admitting the testimony and not instructing the jury as requested by appellant.

4. *The Denial of the Motion for a New Trial*

Appellant urges that the verdict should have been set aside because it was against the weight of the evidence and the result of passion and prejudice.

The role of an appellate court in reviewing a motion for a new trial is well defined. Since such a motion is initially addressed to the discretion of the trial court, its ruling will be reversed only for abuse of discretion. In determining whether to grant a new trial on the basis of insufficient evidence, the trial court cannot do so merely because it might have decided the case differently

than the jury. The credibility of witnesses is for the trier of facts and both the trial and appellate courts should take special care not to invade the jury's function in this regard. A trial court should order a new trial only when convinced that failure to do so would result in a miscarriage of justice. *Rios v. Empresas Lineas Maritimas Argentinas, supra,* 575 F.2d at 990 and cases cited therein.

We have already discussed the question of the sufficiency of the evidence and since we found that the district court did not err in submitting the case to the jury, it follows that the verdict was not against the weight of the evidence and there was no abuse of discretion in denying the motion for a new trial.

Appellant posits its claim of passion and prejudice on three factors: that the jury reached a verdict in less than thirty minutes; the sympathy that plaintiff, as a young widow with seven children, would naturally arouse; and the emotional appeal of deMars "who persisted in living an active life despite the ravaging effects of a progressive and deadly lung and heart condition." Appellant's Brief at 47. This was compounded, appellant asserts, by the court's refusal to submit special interrogatories to the jury. Appellant argues that, in answering the interrogatories, the jury would have had to concentrate on the facts and this would have dampened any passion or prejudice.

We do not think that passion or prejudice is measured by the time a jury takes to arrive at its verdict. The issues in this case were simple and straightforward: whether due proofs of loss were submitted, and the cause of death. As the court told the jury, the case was very well tried. Trial counsel for both sides did an outstanding job in simplifying and clarifying for the jury what could have been confusing medical evidence. The key exhibits were read and discussed during the trial. The court's charge framed the issues accurately and clearly. This was not the type of case in which a jury has to spend a great deal of time sorting and arranging exhibits and

determining the order in which a number of factual issues are to be discussed. Nor was this the kind of case in which special interrogatories would have been particularly helpful. The contents of the special interrogatories requested by defendant were covered adequately in the charge. In short, the case was well tried, well argued, and the jury clearly and correctly instructed. There is no basis for a new trial.

*Affirmed.*