787 F.2d 19
 20 Fed. R. Evid. Serv. 422, Prod.Liab.Rep.(CCH)P 10,952
Sharon COY, Administratrix of the Estate of Charles Coy,
Plaintiff, Appellee,
v.
SIMPSON MARINE SAFETY EQUIPMENT, INC. d/b/a Simpson Sports,
Defendant, Appellant.
 No. 83-1569.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 4, 1985.
Decided March 28, 1986.
 
 1
 Bartram C. Branch, Manchester, N.H., with whom Donald E. Gardner and Devine, Millimet, Stahl & Branch Professional Ass'n, Manchester, N.H., were on brief, for defendant, appellant.
 
 
 2
 Robert M. Larsen, with whom Edward M. Kaplan, Arthur W. Mudge and Sulloway, Hollis & Soden, Concord, N.H., were on brief, for plaintiff, appellee.
 
 
 3
 Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and CEREZO,* District Judge.
 
 
 4
 CEREZO, District Judge.
 
 
 5
 On June 30, 1979, Charles Coy had an accident at the Motor Sport Park track in Loudon, New Hampshire, which caused his death two days later. On that day he had been participating in a motorcycle race and lost control of his motorcycle while exiting turn two of the track. He was thrown off or fell from his motorcycle, hitting the pavement with his head, his right arm and his shoulder. Notwithstanding the fact that the helmet he wore was considered one of the best motorcycle helmets in existence at the time, Charles Coy suffered severe injuries to his brain which were the cause of his death. Thinking that the helmet, rather than protecting him, contributed to Charles Coy's injuries, his estate, administered by his widow, Sharon Coy, sued the manufacturer, Simpson Marine Safety Equipment, Inc., d/b/a Simpson Sports, in federal court alleging diversity jurisdiction and claiming that the helmet was defective. Applying the law of New Hampshire, a jury found in favor of plaintiff and awarded damages in the sum of $488,321.00. Simpson Sports filed this appeal after its motion for judgment notwithstanding the verdict, to set aside the verdict and for a new trial, and its motion for resubmission of the verdict or for remittitur were denied.
 
 
 6
 Appellant claims that the United States District Court for the District of New Hampshire erred in denying its motion for judgment notwithstanding verdict where the verdict was so clearly against the weight of the evidence. We disagree.
 
 
 7
 Plaintiff presented the testimony of eyewitnesses and of an expert in motorcycle accident reconstruction to establish that the accident suffered by Charles Coy was within the limits of the protection capabilities of a helmet meeting the standards of the 1975 Snell Memorial Foundation Test (Snell 75)[1] and that it would have been survivable accident had it not been for the defective helmet.[2] Debra Lacey testified that on the date of the accident she was working at the racetrack as a corner marshal supervising other corner workers in the corner of turn two. She had been attending another rider who had had an accident. She was facing the track when she saw Charles Coy's motorcycle "fishtailing" and then saw him go over the handlebars, off the side of his bike, in a horizontal trajectory. She then saw him land with his head, arm and shoulders on the track and slide about seventy-five to one hundred feet, head first, until he came to a stop. She could not tell which part of his body, of the three mentioned above, hit the ground first, but he did not hit anything else, including his motorcycle, as he fell. As far as she was concerned, there was nothing unusual about Charles Coy's accident.
 
 
 8
 Samuel Walker testified that on the date of the accident he was one of the racers in the ill-fated race at the Loudon racetrack. Charles Coy had just passed him and was in front of him and exiting turn two at approximately sixty miles per hour when he saw his bike leaning far to the left and sparks coming from something on it that was scraping the ground. He then saw the bike start to wobble and develop into a "tank-slapper."[3] Suddenly the motorcycle changed from a sideways position into an upright position and threw Coy off. Samuel Walker could not recall the exact direction in which Charles Coy left his bike nor could he tell how high above the ground he was thrown. He did not see Coy's impact upon the ground. He observed, however, that the motorcycle slid down the track. He did not see it hit Coy. Walker had had a similar accident himself while driving his motorcycle at over one hundred miles per hour and received only minor injuries.
 
 
 9
 Plaintiff's expert witness, Professor Hugh Harrison Hurt, Jr., testified as to certain experiments he performed with different motorcycle helmets, dropping them from a height that, in his opinion, corresponded to the approximate impact velocity of Charles Coy's head upon the ground and having them strike a similar flat surface with essentially the same side as Charles Coy's helmet hit the ground. A special instrument connected to a head form inside the helmet measured and recorded the impact to the head form after the particular helmet had absorbed some of the impact. He then compared the results with the results of other experiments he had done to determine the maximum impact force a human head can withstand, thus determining whether the helmets tested would have offered protection in circumstances similar to those in Charles Coy's accident. He also compared the damage to the shell and to the lining with the damages on the accident helmet. All the helmets tested were either of the same date of manufacture of the accident helmet or met the Snell 75 standards. From the tests, Professor Hurt concluded that all but two of the helmets adequately reduced the impact forces upon the head form, which meant that a human head would not have suffered the type of injuries suffered by Charles Coy. The two that did not adequately reduce the impact force were not Snell 75 certified helmets. In addition, the damage shown by the shells and liners of the tested helmets was markedly different from that found in the accident helmet which showed a concentrated area of crushed liner immediately beneath a fracture in the shell whereas the tested helmets showed wide, flat areas of compression. Those helmets that met Snell 75 standards, except for one Simpson helmet, showed little or no shell fracture and no sign of "oil canning" or bending inward. According to Professor Hurt, it was this "oil canning" effect, of which he found evidence in the accident helmet, which caused the liner in the helmet to "bottom out" before it could spread the impact forces to a wider area, thus transmitting a concentrated force to Charles Coy's head.
 
 
 10
 Plaintiff's expert calculated the approximate impact velocity at which Charles Coy's head hit the ground based on the description of the accident given by some eyewitnesses and on his experience as a motorcycle accident reconstructionist. Based on his experiments with dummies, a motorcycle rider who loses control of the bike and who is flung-off in the same manner as Charles Coy was would fall as if he were being dropped from six or seven feet above the ground or at 13 or 15 miles per hour. According to the evidence, a helmet certified to meet Snell 75 standards should withstand a seventeen miles per hour impact. Professor Hurt explained, however, that in order to cover a possible increase of the impact force caused by rotation of the body the tests were conducted assuming the impact speed was twenty miles per hour.
 
 
 11
 He further testified as to the hardness or rigidness of the accident helmet's shell. He understood that the number of fiberglass cloth layers used in the make-up of a helmet has a "very serious" effect upon the rigidness of the shell. He stated that a good quality helmet should have at least four plies of glass cloth and that premium quality helmets usually take more. He further stated that the rigidness of a four-ply helmet may be almost doubled by the addition of a fifth layer, making it almost seventy to one hundred per cent more rigid. This helmet had been advertised as a premium helmet with a "five-layer, hand laid-up shell." According to Professor Hurt, however, the helmet had only four layers of glass cloth in the area of the impact, thus being too flexible. In his opinion, the oil canning effect which caused Charles Coy's death could have been prevented or delayed by that fifth layer of fiberglass.
 
 
 12
 Professor Hurt also testified that shortly after the accident he tested the helmet as to hardness by using an instrument known as a "Barcol" hand-held impressor which showed that the accident helmet was very soft as compared to the other helmets he tested. He tested the helmet again in 1983 and found that the Barcol readings had increased and were within the expected range. In his opinion, the softness of the shell could be due to the fact that the resin holding the fiberglass together had not completely hardened by the time Charles Coy had the accident. He explained that resin in its original state will harden with time, depending on the exposure to air, but that adding a promoter and a catalyst in appropriate proportions causes the resin to harden within a shorter period of time. On cross-examination, however, he could not specify the model of the Barcol tester he used to test the accident helmet, nor the year in which it was manufactured. He was not aware that other models were available and the only one he knew of was that which he used in his tests. He had tested helmets with Barcol testers since 1958.
 
 
 13
 Greg Gadbois, witness for the appellant, was a corner worker at the Loudon racetrack on the day of Charles Coy's accident. He testified that he saw Charles Coy lose control of his motorcycle and be thrown off when it straightened up after sliding and bending to the left at the exit of turn two. He saw when Charles Coy hit the pavement with his right arm, his shoulder and his head and then slid on his stomach for approximately seventy feet. In his opinion, Charles Coy tried to break the fall with his arm and the head hit the pavement shortly after the arm. He testified that Charles Coy's impact upon the pavement was so hard that he bounced off the pavement a little bit. Nevertheless, he had not expected Coy to be seriously injured.
 
 
 14
 Dr. James A. Newman, an expert in biokinetics with some experience in motorcycle accident reconstruction, testified for the appellant as to the magnitude of the impact of Charles Coy's head upon the ground. In his opinion, the impact velocity of Charles Coy's head upon the pavement was forty miles per hour. This opinion was based on the notion that Charles Coy did not leave his motorcycle until he struck the pavement and that the motorcycle itself was lifted off the ground. These assumptions were initially made based on the type of injuries sustained by Coy and on the distance of seventy feet that he slid after striking the ground. In Dr. Newman's opinion, had Charles Coy left the motorcycle when it was in a vertical position he would have slid several hundred feet and would not have suffered such serious injuries. He felt that his assumption on how the accident occurred had been confirmed the day of the trial by Greg Gadbois' testimony. On cross-examination, he admitted that the estimated impact velocity would be reduced when the speed of the motorcycle is itself reduced as a result of it sliding to the left and its tires catching the pavement again. Similarly, the fact that the slide distance was 100 feet instead of 70 would indicate that the impact velocity was less. In addition, striking the ground first with the elbow and shoulder would have reduced the impact to the head. On redirect, Dr. Newman stated that even considering all these factors the impact velocity to Charles Coy's head would have been reduced by 5% at the most.
 
 
 15
 Another witness for appellant was Simon A. Menzies, President of Simpson Sports. Mr. Menzies testified as to certain facts related to the manufacturing of helmets at the Simpson plant and about his experience working with fiberglass. As to the latter, he testified that in 1975 he helped develop a new technique of laying fiberglass cloth which resulted in a stronger body with fewer layers of cloth, thus resulting in a lighter but stronger body. According to his testimony, Simpson helmets are laid-up following this technique and using twelve-ounce cloth, as compared to ten-ounce cloth used by other manufacturers. He stated that the number of fiberglass layers in a helmet is not determinative of its strength. The thickness of the cloth and the manner in which they are laid-up are also important. He also testified as to the methods of hardening or curing resin. He explained that resin of the type used by Simpson Sports is pink in its original state but that when the catalyst benzoyl peroxide is added it turns brown. According to his testimony, Simpson helmets cure within a half hour to 97% with a 2% catalyst added to the resin. The resin, without any catalyst added, would take one year to eighteen months to harden, as opposed to cure, and would not change color. Resin, with one-sixth of the required volume would cure within four hours. Furthermore, he testified that it would be difficult, if not impossible, to finish-up a helmet which was improperly cured because it would be either too soft or would lack all structural strength to allow sanding. Mr. Menzies had not been working full time at the Simpson plant when Coy's helmet was manufactured. At the time, resin and catalyst were mixed by the individuals laying-up helmets. The person in charge at that time was fired in late 1979 and did not testify before the district court.
 
 
 16
 Mr. Menzies testified also as to the Barcol and other hardness testers. He had bought a Barcol tester a month before the trial, had read the instructions on its appropriate use and had come to the conclusion that the Barcol tester was not designed to test helmets because it cannot be held exactly perpendicular to the helmet and because helmets are not made of homologous material. Nevertheless, a helmet tested in its resin-rich areas should resist a properly calibrated Barcol tester to some degree and should never give a reading of zero. A helmet would not withstand a Barcol-tester calibrated for metals.
 
 
 17
 Professor George G. Snively, founder of the Snell Memorial Foundation and a doctor in medicine, testified for the appellant as to the 1975 Snell Foundation standards and the manner of obtaining certification. He also testified as to his examination of Charles Coy's helmet shortly after the accident. From the injuries received by Charles Coy and from the damage done to the helmet, he concluded that "[t]he fatal injuries in this case undoubtedly resulted from violent head impact, of a magnitude appreciably beyond the ability of this helmet or any currently available helmet to adequately attenuate the energy transfer to the brain." He also performed a hardness test upon the helmet. He compared the results he obtained to those of other similar helmets which he tested for hardness and did not find any significant differences, therefore, he concluded that the accident helmet was not too flexible. In his opinion, the most meaningful and relevant test in determining whether an accident helmet meets the Snell standards is to test the helmet itself on the opposite side of the impact site. He stated that he did not conduct this test because the plaintiff did not authorize it. In his opinion, the number of layers in a helmet is not important; his only concern is that the helmet performs well. Simpson helmets had always passed the Snell 75 performance standards although on occasions the readings obtained in the flat impact tests were slightly high.
 
 
 18
 Considering this and all the evidence in the case in the light most favorable to the plaintiff and without weighing the credibility of the testimony, it may not be said that reasonable men could be led by it to only one conclusion. See Wildman v. Lerner Stores Corp., 771 F.2d 605, 607 (1st Cir.1985) (and cases cited therein). See also Chedd-Angier Production Co. v. Omni Publications International, Ltd., 756 F.2d 930, 934-935 (1st Cir.1985), Curreri v. International Brotherhood of Teamsters Local 251, 722 F.2d 6, 8 (1st Cir.1983), Johnson v. A/S Ivarans Rederi, 613 F.2d 334, 351 (1st Cir.1980), cert. dismissed 449 U.S. 1135, 101 S.Ct 959, 67 L.Ed.2d 325 (1981); deMars v. Equitable Life Assurance Society, 610 F.2d 55, 57 (1st Cir.1979). Moreover, from this evidence the jury could reasonably find that the accident suffered by Charles Coy was not unusually serious and that the impact upon his helmet was within the capabilities of a helmet certified to meet the Snell 75 standards. The jury could also reasonably find that the helmet worn by Charles Coy the day of the accident was defective since its shell deflected inwards upon an impact not in excess of its capabilities, bottoming out the liner and concentrating the impact to the head, either because it had less fiberglass layers than required, even though it had been advertised to contain as many layers, or because the shell was not sufficiently rigid due to a foul-up in the method of curing the resin.
 
 
 19
 Based on the evidence presented at trial, the district court did not err in denying defendant's motion for judgment notwithstanding verdict.
 
 
 20
 As a second error appellant claims that the District Court erred in granting plaintiff's motion in limine excluding testimony at trial regarding the fact that Professor Snively was originally retained by plaintiff to perform an evaluation on Charles Coy's helmet. It is alleged that this information was relevant to the issue of the credibility of Professor Snively and was not unfairly prejudicial. Rules 402 and 403, Fed.R. of Evidence. The error, if committed, was harmless and did not affect substantial rights of the appellant. Rule 61, Fed.R.Civ.Proc., Rule 103(a) Fed.R.Evidence. See S.E.C. v. MacDonald, 699 F.2d 47, 51-52 (1st Cir.1983), Furtado v. Bishop, 604 F.2d 80, 93-94 (1st Cir.1979), cert. denied 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). Abundant evidence was introduced at trial regarding Professor Snively's qualifications. Professor Hurt himself testified that Professor Snively is "the resident genius of helmet testing" and a man who probably knows more about helmet testing than anyone else. Furthermore, there was sufficient evidence from which the jury could infer that plaintiff originally contacted Professor Snively to examine the helmet. The decedent's brother testified that after the accident he recommended to his sister-in-law that the helmet be sent to the Snell Foundation to be examined by Dr. Snively, that in fact he contacted Dr. Snively and that to the best of his knowledge Dr. Snively had examined the helmet. In addition, Professor Snively testified as to the results of an examination of the helmet, made sometime after the accident, in 1979. The report of this evaluation was presented in evidence, albeit without an introductory letter. The district court did not commit reversible error in granting the motion.
 
 
 21
 As third error, appellant charges that the district court erred in failing to instruct the jury as follows:
 
 
 22
 You are instructed that legal fault must be based on causation. So that, even if you find that the helmet worn by Charles Coy was defective and unreasonably dangerous, you cannot find for the plaintiff unless you further find that the plaintiff has proved by a preponderance of the evidence that it was that defect which was the proximate cause of the plaintiff's injury. Therefore, if you find that the helmet in question was defective and unreasonably dangerous, you must further determine whether that defect enhanced Charles Coy's injuries. That is, you may find that the product was defective but that Charles Coy would not have survived the accident in question regardless of what helmet he was wearing and that, therefore, the defect was not the proximate cause of his death.
 
 
 23
 In other words, even though a manufacturer may have designed or constructed a product defectively, it is not liable unless you find by a preponderance of the evidence that this defect enhanced the plaintiff's injuries. If you find that the helmet which Charles Coy was wearing at the time of his accident was defectively designed or manufactured but you further find that Charles Coy would have died as a result of his motorcycle racing accident even if he had been wearing a well designed and manufactured helmet, you must return a verdict for the defendant. (Defendant's request for instruction number 9.)
 
 
 24
 Appellant alleges that the court not only did not charge as requested, but did not charge at all on the concepts of general cause, concurrent cause or superseding cause. Neither did the court mention or define the term "proximate or legal cause" for the jury. Furthermore, appellant complains that the "boilerplate" instructions given to the jury bore no relationship to the facts of the case.
 
 
 25
 It is not clear from the record whether the trial court was sufficiently aware of the scope of appellant's objection based on its not giving the requested instruction on proximate cause as well as of the objection to the form of the charge. The specific grounds of these objections were not stated for the record after delivery of the charge to the jury and no transcript of a conference held in chambers prior to the charge is available. Rule 51, Fed.R.Civ.Proc. is clear that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections." (Emphasis ours.) These objections, and the grounds therefor must be made after the charge, not before. See McGrath v. Spirito, 733 F.2d 967, 968 (1st Cir.1984), Carrillo v. Sameit Westbulk, 514 F.2d 1214, 1219 (1st Cir.), cert. denied 423 U.S. 1014, 96 S.Ct. 445, 46 L.Ed.2d 385 (1975), Dunn v. St. Louis-San Francisco Railway, 370 F.2d 681, 683-684 (10th Cir.1966). Departure from this procedure not only frustrates the purpose of the rule, which is to give the trial judge an opportunity to correct any errors before it is too late, Gay v. P.K. Lindsay Co., 666 F.2d 710, 712 (1st Cir.1981), cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982), but also impedes this court in making a fair determination on whether the judge was in fact given such an opportunity. Although "[i]n our discretion we may overlook insufficient compliance with the rule," Carrillo v. Sameit Westbulk, 514 F.2d 1214 (citing Bouley v. Continental Casualty Co., 454 F.2d 85 (1st Cir.1972), we may do so "only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice." Nimrod v. Sylvester, 369 F.2d 870, 873 (1st Cir.1966). Only where the error in the instructions was committed and "has seriously affected the fairness, integrity or public reputation of judicial proceedings" may we reverse a judgment despite failure to comply with Rule 51. Morris v. Travisono, 528 F.2d 856, 859 (1st Cir.1976) (quoting from Wright and Miller, Federal Practice and Procedure: Civil Section 2558, at 675 (1977) ). We have carefully reviewed the record of this case and find that no such error was committed. The requested instruction was confusing and, insofar as it dealt with "enhanced injuries," irrelevant to the case. Furthermore, we find that the court adequately covered the causation issue. The court correctly instructed the jury on plaintiff's burden of proof on its two causes of action,[4] namely, one brought under an express and/or implied warranty, and the other based on strict liability. In so doing, the court followed closely the language used by the Supreme Court of New Hampshire in Thibault v. Sears, Roebuck & Co., 118 N.H. 802, 395 A.2d 843 (1978) concerning the elements and defenses in a strict liability case. The failure to expound on the definition of "causation" or to speak in terms of "proximate" or "legal" cause was not an error in this case. Cf. Peymann v. Perini Corp., 507 F.2d 1318, 1324, n.3 (1st Cir.1974) (on petition for rehearing), ("[T]he legalese 'proximate' is a word not too helpful to a lay jury, and might well be avoided altogether"), cert. denied 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1972).
 
 
 26
 The fourth and fifth errors alleged by the appellant relate to the exclusion of evidence about the effect of income taxes on the decedent's future earnings and the failure of the court to instruct the jury that it could consider that effect. It contends that although the point is undecided under New Hampshire law, a review of that law indicates that the New Hampshire Supreme Court is likely to favor the admission of such evidence. It cites In re Air Crash Disaster Near Chicago, 701 F.2d 1189 (7th Cir.1983), cert. denied 464 U.S. 866, 104 S.Ct. 204, 78 L.Ed.2d 178, where the Court of Appeals for the Seventh Circuit held that evidence of the income tax liability the decedent would have incurred on was admissible in a wrongful death suit filed in federal court sitting in diversity, where it was clear that the Illinois courts would admit such evidence after the Supreme Court's decision in Norfolk & Western Railway v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) holding that in cases brought under the Federal Employer's Liability Act, 45 U.S.C. Section 51, et seq., even state courts may not prohibit the admission of such evidence. However, we are not convinced that a state's considerations in excluding evidence of tax effect on a decedent's lost earning are altogether procedural in character. The issue is still undecided in New Hampshire. We hold that the district court did not err in excluding such evidence and failing to instruct the jury that it could consider the effect of income tax in determining the loss to the estate. See Spinosa v. International Harvester Co., 621 F.2d 1154, 1158 (1st Cir.1980).
 
 
 27
 The district court's mistake in mentioning "average net wages" in its instruction to the jury regarding its determination of damages and its failure to define "average net wages" was harmless where the verdict shows that the jury was not confused by the use of that term in the instruction and that it arrived at a figure on damages consistent with the testimony of plaintiff's expert on economics, Professor Robert M. Mac Donald. The fourth and fifth alleged errors were not committed.
 
 
 28
 The last error alleged is the district court's denial of appellant's motion for resubmission of the verdict as to damages or, in the alternative, for a remittitur. Appellant alleges that the jury verdict is unreasonably excessive and not supported by the evidence.
 
 
 29
 In reviewing the district court's refusal to set aside the verdict as excessive we consider only whether the court abused its discretion. See McDonald v. Federal Laboratories, Inc., 724 F.2d 243, 246 (1st Cir.1984). A verdict will not be set aside unless it is "grossly excessive," "inordinate," "shocking to the conscience of the court" or "so high that it would be a denial of justice to permit it to stand." Id., quoting from Grunenthal v. Long Island R.R., 393 U.S. 156, 159 n. 4, 89 S.Ct. 331, 333 n. 4, 21 L.Ed.2d 309 (1968). In applying this standard we are required to make "a detailed appraisal of the evidence bearing on damages," Grunenthal, 393 U.S., at 159, 89 S.Ct., at 333, viewing this evidence in the light most favorable to the plaintiff, see McDonald, 724 F.2d, at 246. Furthermore, in a case of a general verdict on compensatory damages, "[o]ur proper review ... is not to parse the award into its various components, but to determine whether the award as a whole is within the universe of possible awards which are supported by the evidence." Clark v. Taylor, 710 F.2d 4, 13 (1st Cir.1983).
 
 
 30
 Appellant's contention is that the components of the general award of $488,321.00 can be easily and unquestionably identified, that the jury made no award for conscious pain and suffering, and that the sum of $62,872.00 corresponding to Professor Mac Donald's estimate of the net loss to the estate of Charles Coy from earnings from MC Enterprises, a business started by the decedent for the purpose of selling motorcycle racing paraphernalia, should be subtracted from the general verdict since that estimate was based on the assumption that MC Enterprises was producing approximately $2,000.00 per year, a fact which was shown to be erroneous by uncontradicted evidence. The evidence alluded to are the income tax returns from MC Enterprises, particularly those corresponding to fiscal year 1978-1979, which show that the business had a net loss that year of $301.00, and Professor Mac Donald's testimony on cross-examination as to the effect of that loss upon his estimate. According to Professor Mac Donald, an assumption that MC Enterprises would lose $300 per year for thirty-two years,[5] rather than make $2,000 per year, would have the effect of reducing the earnings from Charles Coy's principal source of income, namely his job, by $10,000 and the loss to the estate from his anticipated earnings would be reduced. He would not have assumed, however, that the business would continue to be operated thirty-two years if it was going to be such a losing proposition. In such a situation he would have assumed that the business would be discontinued, in which case it would not affect his estimate of loss to the estate from earnings derived from Charles Coy's employment, but the $62,872 attributed to earnings from MC Enterprises would be eliminated. He explained, however, that he could not derive all this from a single tax return; that he would prefer more than one to determine a trend in the business, which might turn profitable after all.
 
 
 31
 We do not think this evidence justifies setting aside the verdict as "grossly excessive." The jury had before it other tax returns from MC Enterprises for the years 1979, 1980 and 1981 which indicate profits, rather than losses, for those years, although by 1981 those profits decreased considerably. Charles Coy's widow, who co-managed the business, testified that at the time of his death the business "seemed to be establishing itself very well," to the point where they had considered one of them giving up his job and going into the business full time. Charles Coy died in mid-1979. During that year the profits of MC Enterprises appear to have been $413.00, a noticeable increase from the previous year. The jury could have reasonably inferred that the profit would have been greater had he lived all of that year. The profits for 1980 were $1,253.00, notwithstanding Charles Coy's absence from the business. In 1981, however, the profits greatly decreased to $154. The jury could have thought that this was the effect of Charles Coy's death upon the business. Based on this and the reasonable inferences therefrom the jury could have accepted Professor Mac Donald's estimate of $2,000.00 per year for thirty-two years as not unrealistic or excessive, if it believed that MC Enterprises had shown some progress and would gradually turn into a profitable venture. We do not think that its verdict is "inordinate" or "shocking to [our] conscience," nor "so high that it would be a denial of justice." Moreover, this was a case where the jury could have found a considerable amount of pain and suffering, in light of evidence that Charles Coy was in a semi-conscious agitated condition for at least one day. The district court did not abuse its discretion in refusing to set aside the verdict.
 
 
 32
 No prejudicial error having been committed, the judgment of the district court is
 
 
 33
 Affirmed.
 
 
 
 *
 Of the District of Puerto Rico, sitting by designation
 
 
 [1]
 The Snell Memorial Foundation is an institution founded by Professor George G. Snively which, as part of its general objective of increasing vehicular safety, issues standards and tests helmets which are certified if complying with those standards. The Snell 75 standards are the standards issued in 1975
 
 
 [2]
 An expert economist also testified as to the amount of damages suffered by the estate
 
 
 [3]
 "Tank-slapping" is the movement of the motorcycle's handle bars hitting the tank
 
 
 [4]
 The court referred to these as "theories of liability."
 
 
 [5]
 Thirty-two point three (32.3) years was Charles Coy's expected work life