WELLS REAL ESTATE, INC.,
Plaintiff, Appellant,

v.

GREATER LOWELL BOARD OF RE-
ALTORS, et al., Defendants,
Appellees.

No. 87–1238.

United States Court of Appeals,
First Circuit.

Heard Feb. 1, 1988.

Argued June 23, 1988.

804

David F. Cavers, Jr., with whom Richard W. Mable and Powers & Hall, P.C., were on brief, for plaintiff, appellant.

John M. Harrington, Jr., Boston, Mass. (for defendant, appellee Nat. Ass'n of Realtors) with whom Thomas H. Hannigan, Jr., Ropes & Gray, Stuart T. Rossman, Gaston Snow & Ely Bartlett, Elizabeth M. Fahey, Morrison, Mahoney & Miller, David M. Roseman, Andrew M. Higgins, and Casner, Edwards & Roseman, Boston, Mass., were on consolidated brief for defendants, appellees.

Theodore E. Dinsmoor, Boston, Mass., for defendants, appellees Greater Lowell Bd. of Realtors, Inc., its individual members, Greater Boston Real Estate Bd., Inc., and Greater Salem and Lynn Boards of Realtors, Inc.

D. Alice Olsen, Boston, Mass., for defendants, appellees Eastern Middlesex, and Quincy and South Shore Boards of Realtors, Inc.

Before COFFIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and PETTINE,* Senior District Judge.

COFFIN, Circuit Judge.

This is the anticlimactic end of a prolonged antitrust litigation involving two consolidated suits over the course of more than fifteen years. Although a number of interesting issues were argued on appeal, most of them fall by reason of the jury's finding that plaintiff had failed to establish that defendants' activities had a substantial effect on interstate commerce, a necessary element for liability under the Sherman Act. We affirm the judgments.

## I. FACTS

The plaintiff, Wells Real Estate, Inc. ("Wells"), was a real estate brokerage located in Billerica, Massachusetts. Wells was started by George Livadas in 1959 in Burlington, Massachusetts. Its major focus of business was homes in the Lowell area, in particular those in the towns of Billerica and Tewksbury. Until 1966 or 1967, Wells prospered. In the early 1960s, Mr. Livadas attempted to expand the brokerage, through separate corporations, to other areas of Massachusetts. But in the middle of that decade, Wells was suddenly faced with the growing threat of serious competition from the defendant realtors comprising the Greater Lowell Board of Realtors (the "Lowell Board"), another defendant in this case. In response to this competition, Livadas reconsolidated all of Wells' operations in the Burlington office, which was later moved to Billerica.

Ever greater numbers of realtors were drawn to the area by the advantages offered by the Lowell Board. In particular, the Board provided a "multiple listing service" ("MLS"), which enabled member brokers to cooperate on the sale of a much larger number of houses than if they remained independent. Board members submitted their procured listings for houses to the Board. The list of all of the members' houses was then available to the entire membership to try to sell. When a house was sold, the profit would be split in some agreed upon percentage between the listing broker and the selling broker. The rate of commission was set by the listing broker. According to evidence submitted by the plaintiff at trial, the rate of commission was almost always about 6 percent, and the commission split between lister and seller was invariably 50 percent/50 percent of that rate. As a condition of membership in the Board, a realtor was required to adhere to the constitution and by-laws of the national sponsor of the local board, the National Association of Realtors (the "NAR"). The NAR, also a defendant here, establishes methods of arbitration between realtors, and a basic set of rules by which board practices, including the MLS, are to be run. The NAR also imposes on its member boards and realtors a national Code of Ethics for real estate sales.

The MLS dramatically increased the number of brokers in the greater Lowell area. Wells' percentage of sales began to drop precipitously. Wells was further dis-

* Of the District of Rhode Island, sitting by designation.

advantaged by the fact that the listings in the MLS were all "exclusive right to sell" listings, wherein the homeowner agrees to pay the broker the commission rate even if the house is sold by another broker or by the homeowner. This practice effectively removed all MLS houses from the rest of the market, and thus precluded non-member realtors from attempting to broker those sales.[1]

Wells chose not to join the Lowell Board. Mr. Livadas preferred the old fashioned method, whereby everyone hunted down his own listings and had to be quick to close sales in order to beat the other brokers to the punch. Wells had prospered as long as that was the prevailing method. Livadas eschewed the MLS, apparently because he did not share its members' implicit belief in the benefits of cooperation. He testified that "[m]y job is to earn a living and not to facilitate other brokers to get listings." The MLS, in his opinion, eliminated the rewards for the hard-working realtor by letting some realtors get by on simply collecting the commission split on sales without having to do the groundwork of procuring the listing. His description of the changing market revealed a nostalgia for the good old days, when profits were proportional to time and effort: "[Before the MLS] it was a real competition. And the good ones survived and the lazy ones would die. But today you have the opposite, ... the parasites. The lazy ones survive because the system allows them to survive." Most of Wells' listings remained open, because of the competitive pressures imposed by the MLS.

In part because of Livadas' principled intransigence, Wells' fortunes quickly evaporated. Its market share in the area was about 21% in 1965, with annual sales of 286 houses. By 1976, Wells could sell only 56 houses. Meanwhile, the Lowell Board MLS's share of the market increased from approximately 36% in 1964 to about 53% in 1978. Wells was soon heavily in debt, and had to cease operations in 1979.

In 1972, Wells brought suit against the Lowell Board of Realtors and its individual members for various violations of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 & 2. Wells alleged both a boycott of Wells from the MLS and a conspiracy to monopolize the local real estate industry. Wells also claimed that the MLS constituted an illegal tying arrangement, wherein access to the listings (the tying product) was impermissibly conditioned on membership in the Board with all its attendent conditions (the tied "product"). In addition, Wells alleged various price-fixing violations, claims that were dismissed on summary judgment in 1984. This 1972 action also named as defendants the National Association of Real Estate Boards (now the NAR), and the state "parent" real estate boards of both Massachusetts and New Hampshire. The New Hampshire State Board was dismissed by the court in 1981.

In 1973, Wells instituted a similar action against all of the other local real estate boards in Massachusetts, on the theory that Wells effectively was deterred from entering those markets by similar MLS schemes statewide. The price-fixing claims were dismissed by the court at the outset of trial in January 1987, and shortly thereafter Wells filed stipulations of dismissal with respect to all claims against all but five of the local boards in the 1973 case.

Wells contended that the Boards restrained competition by preventing access to the exclusive listings of the MLS; that the MLS members conspired to set uniform commission rates throughout the market; and that the realtors on the boards illegally set uniform commission "splits" for distributing the profits made off of the MLS. Wells claimed that these practices effectively served as an illegal boycott against

---

1. The other two common types of listings, which provide far less security for the brokers utilizing them, are the "open" listing and the "exclusive agency" listing. An open listing is an agreement that the broker will get the commission only if that broker procures the buyer. This enables the homeowner to list with multiple brokers but pay a commission to only one. This naturally provides for far less security for the broker and far more competition between brokers. The exclusive agency listing is the same as the exclusive right to sell listing, except that the broker does not receive a fee if the homeowner sells the home.

those unwilling to join the boards. Plaintiff's primary argument was that access to the MLS should not have been conditioned on joining the boards, adhering to the rules established by the boards, and acceding to the conditions of sales and commissions required by the boards for access to the MLS. Wells also contended that the brokers illegally conspired to exclude others from the market so as to achieve a monopoly therein. The conspiracies to boycott and monopolize allegedly caused a substantial reduction in competition amongst brokers in the area and unreasonably restrained a substantial amount of interstate commerce.

The cases were consolidated for trial, which finally began in early 1987. At the close of the plaintiff's evidence, the court directed verdicts for the remaining five boards in the 1973 case. At the close of all the evidence, the court directed a verdict for the remaining defendants (those from the 1972 case) on the tying claim. The remainder of the case was submitted to the jury on a special questionnaire. The jury was asked to answer specific interrogatories regarding the group boycott and conspiracy to monopolize claims. Based on the jury's answers to those questions, judgment was entered for all defendants on each remaining count.

Wells appeals that jury verdict on numerous grounds, including, *inter alia,* that the jury was wrongly instructed on interstate commerce; that the jury's findings on interstate commerce were not supported by the record; that the court's instructions on causation of injury were erroneous; that the verdict was inconsistent; and that the court failed in the instructions properly to distinguish between per se and rule of reason standards for testing antitrust violations. Plaintiff also appeals the directed verdicts in favor of the 1973 case defendants, and the directed verdicts for the remaining defendants on the tying claim. Finally, Wells finds fault with numerous evidentiary and pre-trial discovery rulings made by the court.

## II. THE JURY VERDICTS

On both the boycott and the monopoly claim, the district court properly found that the jury's answers to the special interrogatories could not support a verdict for the plaintiff. In particular, the jury found that although the activities of some of the defendants did deny Wells access to the MLS, unreasonably exclude brokers from the market, and cause a substantial reduction in competition within that market,[2] such activities (1) were not the predominant cause of Wells' decline and fall, and (2) did not unreasonably restrain a substantial amount of commerce between the states.[3] We need not discuss the causation element, nor any of defendants' other theories of liability, because we find that the plaintiff has failed to establish a requisite finding of effect on interstate commerce to satisfy that necessary element of its Sherman Act claims. Such a failure is dispositive of the claims.

### A. *Improper Instructions on Interstate Commerce*

Plaintiff now claims that the jury was improperly instructed on the interstate commerce element of Wells' claims. On each count, the jury was asked whether the defendants' allegedly anticompetitive activities "unreasonably restrain[ed] a substantial amount of commerce between the states." On both counts, the jury answered "no." Appellant argues that it was improper to constrict the focus of the interstate commerce element to the *challenged* activities of the defendants. Instead, Wells contends, the questions should have been (1) whether defendants' activities *generally* were in or affected interstate commerce, and then (2) whether there was a connection, "in practical economic terms," between defendants' activities generally

---

**2.** The jury unequivocally found that the plaintiff had failed to prove that the activities of the national and state board of realtor defendants had any noncompetitive effect.

**3.** There were various other theories on which the defendants argued that the jury answers necessitated judgment in their favor, but the district court relied solely on the two reasons mentioned in the text.

and those particular activities challenged in the lawsuit as anticompetitive.

If we could consider the argument, it would have substance. In *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), the Supreme Court held that an antitrust plaintiff does not have to prove a direct, "particularized" connection between the challenged activity and interstate commerce. 444 U.S. at 242–43, 100 S.Ct. at 509–10. "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases." *Id.* at 243, 100 S.Ct. at 509 (citations omitted).

■ But despite some language suggesting the contrary in *McLain, see id.* at 242, 100 S.Ct. at 509, neither is it sufficient merely to show that some aspect of the defendant's activity generally had a substantial effect on interstate commerce. If that were the case, the interstate commerce element would invariably be satisfied without even an inkling of proof that the challenged activity was in any way connected to that part of the defendant's business that affected interstate commerce. Rather, we have held, in *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank, N.A.*, 649 F.2d 36, 45 (1st Cir.1981), that the proper focus is on language found later in *McLain*, emphasizing "the requirement that [defendants'] activities which allegedly have been infected by a[n] [anticompetitive] conspiracy be shown 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246, 100 S.Ct. at 511 (quoting *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976)).

We have interpreted *McLain* as holding that "a plaintiff need not prove that a defendant's unlawful activities *actually* affected interstate commerce; but ... [rather] that defendants' business still must be so connected with interstate commerce that it is logical, as a matter of practical economics, to believe that the unlawful activity will affect interstate commerce." *Cordova & Simonpietri*, 649 F.2d at 45. This reading has been adopted by numerous other circuits as well. *See, e.g., Sarin v. Samaritan Health Center*, 813 F.2d 755, 758 & n. 2 (6th Cir.1987); *Seglin v. Esau*, 769 F.2d 1274, 1280 (7th Cir.1985); *Hayden v. Bracy*, 744 F.2d 1338, 1343 & n. 2 (8th Cir.1984); *Furlong v. Long Island College Hosp.*, 710 F.2d 922, 925–26 (2d Cir.1983); *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715, 720–24 (10th Cir.1981) (en banc). *But see Western Waste Service Systems v. Universal Waste Control*, 616 F.2d 1094, 1097 (9th Cir.1980) (only defendant's business generally need affect interstate commerce). It is this standard that appellants urge on us here, and we agree that it would have been proper to instruct the jury in such a manner.

■ Unfortunately for plaintiff, however, Wells' attorneys did not ask for the "practical economics" instruction at the charge conference prior to closing arguments. Instead, counsel proffered precisely the interpretation of *McLain* that we rejected in *Cordova & Simonpietri*. App. 3481–83. "My only point," counsel contended, "is my understanding of *McLain* as well as the *Cordova* case is it is not the alleged illegal acts that need to be in commerce, but rather activities of the defendants generally, illegal or legal." *Id.* at 3482–83. This request was properly rejected by the court, as it does not comport with our reading of *McLain*.[4] *See Ouimette v. E.F. Hutton & Co., Inc.*, 740 F.2d 72, 76 (1st Cir.1984) ("a requested instruction to the jury may be correctly refused if it is

4. Similarly, plaintiff's submitted requested instruction was: "It is sufficient, in the case of each defendant, that its activities either cross state lines or had a substantial impact on interstate commerce." App. 3143. Though some of the examples thereafter provided would properly satisfy the interstate commerce element as described in *Cordova & Simonpietri*, the requested standard was not sufficiently precise, and arguably mischaracterized the plaintiff's burden.

improper or erroneous"). Although the court's eventual instruction to the jury erred in the other extreme, plaintiff never asked for a correct definition of the interstate commerce element. An exception on one ground cannot serve as the basis for another, on a different ground, on appeal. *Gillentine v. McKeand*, 426 F.2d 717, 723 n. 19 (1st Cir.1970).[5]

Even if plaintiff's requested instruction had been proper, counsel failed to raise that objection again subsequent to the actual charge. According to a long line of precedents in this circuit, such an omission constitutes waiver of the objection pursuant to Federal Rule of Civil Procedure 51.[6] *See, e.g., Brown v. Freedman Baking Co., Inc.*, 810 F.2d 6, 9 (1st Cir.1987); *Coy v. Simpson Marine Safety Equipment, Inc.*, 787 F.2d 19, 26 (1st Cir.1986); *Emery-Waterhouse Co. v. Rhode Island Hosp. Trust Nat'l Bank*, 757 F.2d 399, 411 (1st Cir. 1985); *McGrath v. Spirito*, 733 F.2d 967, 968–69 (1st Cir.1984); *Monomoy Fisheries, Inc. v. Bruno & Stillman Yacht Co.*, 625 F.2d 1034, 1036 (1st Cir.1980); *Carrillo v. Sameit Westbulk*, 514 F.2d 1214, 1219 (1st Cir.1975); *United States v. Taglianetti*, 456 F.2d 1055, 1056–57 (1st Cir.1972); *Rivera v. Rederi A/B Nordstjernan*, 456 F.2d 970, 976 (1st Cir.1972); *Dunn v. St. Louis–San Francisco Ry. Co.*, 370 F.2d 681 (10th Cir.1966) (Aldrich, J., sitting by designation); *Marshall v. Nugent*, 222 F.2d 604, 615 (1st Cir.1955).

In this case, the court gave counsel abundant opportunity to object to the charge after it was given. An extensive post-charge conference was held with all counsel present. Counsel for the defendants took numerous exceptions to the charge. Plaintiff's attorney did reiterate several of his prior requests and exceptions, but with no mention of interstate commerce. Given this "ample opportunity" at the post-charge conference, appellant cannot now be said to have avoided waiver of its exception to the interstate commerce charge. *See Joia v. Jo–Ja Service Corp.*, 817 F.2d 908, 917 (1st Cir.1987).

With that waiver, the instruction as given becomes the law of the case. *See Shepp v. Uehlinger*, 775 F.2d 452, 455–56 (1st Cir.1985) (citing *Moomey v. Massey-Ferguson, Inc.*, 429 F.2d 1184, 1187 (10th Cir.1970)). That being so, the jury's answers leave appellant without any finding of the necessary element of interstate commerce. Without that finding, appellant has not met its burden of proving a Sherman Act violation.

■ We have recognized a "plain error" exception for failures to adhere to Rule 51. However, the plain error rule "should be applied sparingly and only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice." *Nimrod v. Sylvester*, 369 F.2d 870, 873 (1st Cir.1966). We have adopted the standard for plain error in the Rule 51 context expressed by professors Wright and Miller: " 'If there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings.' " *Morris v. Travisono*, 528 F.2d 856, 859 (1st Cir.1976) (quoting 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2558, at 675 (1971)). At the time *Morris* was decided, we had never reversed a civil case on this basis, 528 F.2d at 859, and we have continued to acknowledge the plain error rule without, to our knowledge, ever using it to upset a verdict. *See, e.g., Elwood v. Pina*, 815 F.2d 173, 176 (1st Cir.1987); *Al-*

---

**5.** Assuming that counsel meant by his vague statements to suggest the definition of the interstate commerce he now urges us to adopt, such a request was not made with sufficient "distinctness" to satisfy the dictates of Federal Rule of Civil Procedure 51. *See, e.g., Elwood v. Pina*, 815 F.2d 173, 175–76 (1st Cir.1987); *Jordan v. United States Lines, Inc.*, 738 F.2d 48, 51 (1st Cir.1984). "Objections must be 'sufficiently specific to bring into focus the precise nature of the alleged error.' " *Gay v. P.K. Lindsay Co., Inc.*,

666 F.2d 710, 712 (1st Cir.1981) (quoting *Palmer v. Hoffman*, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943)).

**6.** Rule 51 reads in pertinent part: "No party may assign as error the giving [of] or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

*monte v. National Union Fire Ins. Co.,* 787 F.2d 763, 769 (1st Cir.1986); *Coy v. Simpson Marine Safety Equipment, Inc.,* 787 F.2d 19, 26 (1st Cir.1986); *Ouimette v. E.F. Hutton & Co., Inc.,* 740 F.2d 72, 76 n. 4 (1st Cir.1984); *McGrath v. Spirito,* 733 F.2d 967, 969 (1st Cir.1984). We find no exceptional or peculiar circumstances that make the present case any different. The plain error exception is inappropriate here, especially since plaintiff's requested instruction at the pre-charge conference represented a misstatement of the applicable law.

**B.** *Judgment Notwithstanding the Verdict*

Appellant argues in the alternative that the jury's answers on interstate commerce were wrong, that there was "no evidence to support the jury's findings that there was not the requisite effect on interstate commerce." Appellant asks that we "reverse" the jury's findings.

■ We do not reach the issue of the sufficiency of the evidence, however, because plaintiff's counsel failed to move for a judgment notwithstanding the verdict in the district court. Therefore we have no decision of the district court to consider. In fact, plaintiff failed to move at any time for a directed verdict under Federal Rule of Civil Procedure 50(a). Motion for directed verdict must be made at the close of all evidence; moving at the close of one's opponent's evidence generally will not suffice. *See, e.g., R & R Associates, Inc. v. Visual Scene, Inc.,* 726 F.2d 36, 38 (1st Cir.1984).[7] The motion must also be made with sufficient specificity to allow the district judge to understand precisely why the evidence is insufficient. Appellate review may be obtained only on the specific ground stated in the motion for directed verdict. *Pstragowski v. Metropolitan Life*

*Ins. Co.,* 553 F.2d 1, 3 (1st Cir.1977). A motion under Rule 50(b) for judgment notwithstanding the verdict cannot be made unless the motion for directed verdict was properly brought before the court. *Javelin Investment v. Municipality of Ponce,* 645 F.2d 92, 94 (1st Cir.1981).

"[A] federal appellate court may not reverse for insufficiency of the evidence in the absence of an unwaived motion for directed verdict." *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico,* 536 F.2d 443, 445 (1st Cir.1976). *See also Javelin Instrument,* 645 F.2d at 94. Plaintiff in this case did not make any motion at any time for a directed verdict or a judgment notwithstanding the verdict on the issue of interstate commerce. The court was never asked to withhold the interstate commerce question from the jury because of undisputed evidence on that issue, despite ample opportunity for counsel to do so. Therefore, we cannot review a claim of insufficiency of the evidence.

**C.** *New Trial*

■ Waiver of the right to request judgment notwithstanding the verdict does not, however, preclude a party from moving for a new trial. *See Della Grotta v. Rhode Island,* 781 F.2d 343, 350 (1st Cir.1986). Appellant now asks us to order a new trial because the jury's verdict on the interstate commerce issue is against the weight of the evidence. But here, too, counsel's failure properly to preserve this contention forecloses review in this court.

■ "The authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). *See also McDonough*

---

7. Under very rare circumstances, such a motion need not be repeated at the close of all evidence if such a repetition is clearly superfluous or futile. *See Beaumont v. Morgan,* 427 F.2d 667 (1st Cir.1970); *Bayamon Thom McAn, Inc. v. Miranda,* 409 F.2d 968 (1st Cir.1969). However, such a case will be unusual, existing only when the additional evidence is so insubstantial as to make no possible difference as to sufficiency, and when, as in *Bayamon Thom McAn,* the lag between the close of plaintiff's evidence and the end of trial is negligible. *See Della Grotta v. Rhode Island,* 781 F.2d 343, 350 (1st Cir. 1986); ); *Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.,* 583 F.2d 565, 569–70 (1st Cir. 1978); *Gillentine v. McKeand,* 426 F.2d 717, 722–23 (1st Cir.1970).

*Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984) (error for appellate court not to defer to discretion of trial court in decision on new trial). Only an abuse of that discretion will trigger reversal of a denial of a motion for new trial. *See Conway v. Electro Switch Corp.,* 825 F.2d 593, 598 (1st Cir.1987); *Sprague v. Boston & Maine Corp.,* 769 F.2d 26, 27–28 & n. 3 (1st Cir. 1985), and cases cited therein. This is especially true where the motion for new trial is made because the jury's verdict allegedly is against the weight of the evidence. *See Keeler v. Hewitt,* 697 F.2d 8, 11 (1st Cir. 1982). That is the sort of decision most appropriately left to the broad discretion of the trial court, because it is directly predicated on the facts and evidence adduced at trial, and because a jury's verdict on the facts should only be overturned in the most compelling circumstances.

▬ "Where ... the district court's ruling would call into play a discretionary matter, peculiarly appropriate for that court, it becomes more important to bring the error first to that court's attention." *Sampson v. Eaton Corp.,* 809 F.2d 156, 161 (1st Cir.1987). Thus, a motion for new trial must be made in the first instance before the trial court, particularly where the weight of the evidence is at issue. *See* 6A *Moore's Federal Practice* § 59.15[3], at 326–27 (2d ed. 1987). *Cf. Carlton v. H.C. Price Co.,* 640 F.2d 573, 577 (5th Cir.1981) (no appellate review of allegedly excessive or inadequate damages where trial court not given opportunity to exercise its discretion on the matter); *Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281, 1285 (1st Cir.1971) (same). Such a motion must be made not later than ten days after the entry of judgment. Fed.R.Civ.P. 59(b).

Plaintiff here never moved for a new trial, on weight of the evidence or any other ground. This claim too, then, has not been preserved for appeal.

D. *Interstate Commerce as a Non–Jury Issue of Jurisdiction*

▬ In its reply brief, appellant raises for the first time yet another alternative argument. Appellant claims that, because the interstate commerce element allegedly is "jurisdictional" in nature, it was error to submit any special question to the jury "where there was no factual conflict whatsoever." Appellant cites *Gough v. Rossmoor Corp.,* 487 F.2d 373 (9th Cir.1973), wherein the Ninth Circuit seemed to hold that the "jurisdictional" interstate commerce issue should never be submitted to the jury, even where the evidence is in dispute. *Id.* at 377.

This assertion has also been waived, because appellant raised it for the first time in its reply brief. *See Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983). Even if appellant had timely raised the issue on appeal, however, this argument also was never made to the trial court. A party cannot be heard to complain in this court that the trial court should have made a preliminary determination of an issue rather than sending it to the jury if the party did not request such action from the court itself. *McGrath v. Spirito,* 733 F.2d 967, 969 (1st Cir.1984) (waiver of request that trial court make preliminary determination of constitutionality of city council rule). Plaintiff therefore argues in the alternative that, *because* the question of interstate commerce is "jurisdictional," there can be no waiver on that issue. Appellant insists that jurisdictional arguments can be raised at any time, despite numerous failures to preserve those arguments in the district court.

We reject both arguments. The interstate commerce question is not a strictly jurisdictional issue in the sense that appellant suggests. But even if it were, appellant's failure to preserve is dispositive.

In *Gough v. Rossmoor Corp.,* the Ninth Circuit decided that the interstate commerce question was "jurisdictional" *rather than* "substantive," and thus suggested that such a question should not be decided by the jury. *Id.* at 377. This characterization of the interstate commerce element as "jurisdictional" is not aberrant, for even Chief Justice Burger refers to it that way repeatedly in *McLain.* 444 U.S. at 234, 235, 237, 239, 240, 242, 243, 244, 245, 246,

100 S.Ct. at 505, 505, 506, 507, 508, 509, 509, 510, 510, 511. The genesis of such a practice seems to lie in the fact that without the requisite effect on interstate commerce, no Sherman Act violation can be proved, and without a Sherman Act violation in fact, there is no basis for this sort of action to be in *federal* court. The statute provides the basis for both the substantive claim and the federal subject matter jurisdiction.

This confluence of jurisdiction and substance "confuse[s] the issue of the district court's authority to hear a case with the issues of the adequacy of the complaint and the plaintiffs' ability to prevail on the merits of their claim." *Ortiz de Arroyo v. Barcelo,* 765 F.2d 275, 279 (1st Cir.1985). "Subject matter jurisdiction does not depend on the plaintiffs' ability to prove the elements of their cause of action in their complaint." *Id.* This fundamental principle has been well-established from the time of the Supreme Court's seminal decision in *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Justice Black wrote:

> Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which [plaintiffs] could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

*Id.* at 682, 66 S.Ct. at 776 (footnotes and citations omitted). *See also Cloutier v. Town of Epping,* 714 F.2d 1184, 1188 (1st Cir.1983); *Chiplin Enterprises, Inc. v. City of Lebanon,* 712 F.2d 1524, 1528–29 (1st Cir.1983).

It is safe to say, therefore, that interstate commerce is not the sort of subject matter jurisdiction issue that is wholly independent of the factual elements of the substantive claim. In fact, they are so "closely intertwined" that it is unfair to characterize interstate commerce as "jurisdictional" at all, at least in the way that plaintiff now suggests.

Indeed, if the interstate commerce question were to be considered jurisdictional in nature, the plaintiff would have the burden of establishing the requisite facts supporting the pleading in response to a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). But on a motion to dismiss under Rule 12(b)(6)—for failure to state a claim—the plaintiff's pleadings are accepted as true for the purposes of the motion.

The Supreme Court has discouraged motions to dismiss on the interstate commerce ground, holding that plaintiffs should be given "ample opportunity for discovery" to establish the factual predicates of the interstate commerce element. *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). More recently, the Court has suggested that summary judgment can also be a premature juncture for disposition of the interstate commerce question, explicitly assuming that it could be a jury question. *McLain,* 444 U.S. at 245, 100 S.Ct. at 510 ("it cannot be said that there is an insufficient basis for petitioners to proceed to trial to establish Sherman Act jurisdiction").[8]

---

**8.** The Ninth Circuit, in a long series of cases on this issue subsequent to *Gough,* has come to essentially the same conclusion, thereby undercutting the authority of *Gough* for Wells' contention. *See Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.,* 711 F.2d 138, 139–40 (9th Cir. 1983) (jurisdictional finding on motion to dismiss inappropriate when jurisdictional and substantive issues are so intertwined that one is dependent on the other); *Hasbrouck v. Texaco, Inc.,* 663 F.2d 930, 933–34 (9th Cir.1981) ("jurisdictional issue" of whether sales were "in commerce" is "normally a fact question for the jury to resolve"); *Western Waste Service Systems v. Universal Waste Control,* 616 F.2d 1094, 1095–96 n. 1 (9th Cir.1980); *Thornhill Publishing Co., Inc. v. General Telephone & Electronics Corp.,* 594 F.2d 730, 733–35 & n. 10 (9th Cir.1979);

### E. Waiver and Jurisdiction

 As we demonstrate above, plaintiff is mistaken in characterizing the interstate commerce question as strictly "jurisdictional." But even were we to agree that interstate commerce is a jurisdictional question, appellant's argument that such jurisdictional questions cannot be waived still fails, because appellant misconstrues the rule concerning jurisdiction and waiver discussed in *Eisler v. Stritzler*, 535 F.2d 148 (1st Cir.1976). That rule holds that the *absence* of subject matter jurisdiction can be raised at any time in the litigation, regardless of waiver or stipulation. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 106 S.Ct. 1326, 1331 & n. 4, 89 L.Ed.2d 501 (1986) and cases cited therein; *United States ex rel. P.J. Keating Co. v. Warren Corp.*, 805 F.2d 449, 451 (1st Cir.1986) ("subject matter jurisdiction may be *challenged* at any time before the case is finally decided") (emphasis supplied); *Daley v. Town of New Durham*, 733 F.2d 4, 7 (1st Cir.1984) ("defect" in subject matter jurisdiction cannot be cured by waiver or consent); Fed.R.Civ.P. 12(h)(3) (dismissal when court "lacks" jurisdiction). *See also Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1162 n. 6 (1st Cir. 1987) (jurisdictional "defenses" cannot be waived). This exception to the strict rules of waiver is necessary to prevent federal courts from adjudicating cases over which they have no authority. The exception implicates an issue of the court's *power*. *See American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17–18, 71 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951); *United States v. United States Fidelity Co.*, 309 U.S. 506, 514, 60 S.Ct. 653, 657, 84 L.Ed. 894 (1940); *Gilbert v. David*, 235 U.S. 561, 568, 35 S.Ct. 164, 166, 59 L.Ed. 360 (1915); *Daley*, 733 F.2d at 7 ("without subject matter jurisdiction,

the court has no power to hear and decide the case"). This sort of jurisdictional bar to the court's power may be raised for the first time on appeal, or even by the appellate court or Supreme Court sua sponte. *Bender*, 106 S.Ct. at 1331; *City of Kenosha v. Bruno*, 412 U.S. 507, 511, 93 S.Ct. 2222, 2225, 37 L.Ed.2d 109 (1973) (quoting *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908)); *Hydrogen Technology Corp.*, 831 F.2d at 1162 n. 6; Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

By contrast, appellant here asks us to decide that the court (and the factfinder) was mistaken in finding that subject matter jurisdiction did *not* exist. On Wells' view of "jurisdiction," the jury (incorrectly) decided, based on the court's (incorrect) special question, that the court lacked subject matter jurisdiction in the first instance. Despite its numerous waivers, Wells argues, this "jurisdictional" question can be reviewed at any time. This contention misconstrues the "unwaivability" rule. The court's final judgment that it did not have "jurisdiction" in no way means that the court was acting outside its power in entertaining the controversy. On the contrary. While not necessary to our decision because of our holding that the question is not strictly jurisdictional, we find that the jurisdictional exception to the waiver rule would nevertheless be inapposite here.[9]

Wells failed to preserve objections to: (1) the fact that the question went to the jury at all; (2) the nature of the question that was submitted to the jury; (3) the sufficiency of the evidence to support the jury's finding; and (4) a verdict allegedly against the clear weight of the evidence. The ver-

*Berardinelli v. Castle & Cooke Inc.*, 587 F.2d 37 (9th Cir.1978) (following *Gough*) (distinguished in *Thornhill*, 594 F.2d at 735); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 601–03 (9th Cir.1976) (discouraging pre-trial dispositions of commerce issues).

For an early, thorough discussion of this problem in Sherman Act cases, see *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 890–96 (3d Cir.1977).

9. For instance, if a district court dismisses an action because the complaint fails adequately to allege federal jurisdiction, the plaintiff cannot receive relief in this court on another theory of jurisdiction that was not pleaded and not raised in the district court, despite the fact that the issue is undoubtedly "jurisdictional."

dict of the jury therefore must be upheld, because the plaintiff has failed to establish the requisite degree of effect on interstate commerce.

### III. THE TYING CLAIM

We turn now to the directed verdict for the defendants on appellant's tying claim. Appellant claims that conditioning access to the MLS on membership in the Boards constituted an impermissible tying claim, illegal per se under the Sherman Act.

Tying arrangements involve the use of leverage over the market for one product (the "tying" product) to coerce purchases of a second product (the "tied" product). In this case, the MLS is the alleged "tying" product, and the Board membership is the ostensible "tied" product. The anticompetitive effect of an illegal tying arrangement takes place in the market for the tied product.

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). *See also id.* at 13 n. 19, 104 S.Ct. at 1558 n. 19 (quoting *Fortner Enterprises v. United States Steel Corp.,* 394 U.S. 495, 512–14, 89 S.Ct. 1252, 1263–64, 22 L.Ed.2d 495 (1969) (*Fortner I*) (White, J., dissenting)) (explaining deleterious effect in tied product market).

In order to show an illegal tying arrangement, a plaintiff must demonstrate three separate elements: (1) that an actual tie exists between two separate products, such that purchase of one is conditioned on purchase of the other; (2) that the seller has sufficient "market power" in the tying product to compel acceptance of the tied product; and (3) that the tie affects a "not insubstantial" amount of interstate commerce in the market for the tied product. *See Fortner I,* 394 U.S. at 498–501, 89 S.Ct. at 1256–58; *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958); *Kenworth of Boston, Inc. v. Paccar Financial Corp.,* 735 F.2d 622, 623–24 (1st Cir.1984).

The district court dismissed Wells' tying claim on the theory that Wells had no standing to bring such a claim because it was neither a purchaser of nor a competitor in the market for the tied "product," real estate board memberships. We affirm the dismissal, but on alternative grounds.

A plaintiff need not have actually consented to the purchase of the tying and tied products in order to bring a claim under the Sherman Act. *See, e.g., Systemized of New England, Inc. v. SCM, Inc.,* 732 F.2d 1030, 1033 (1st Cir.1984) (after plaintiff backed out of the tying arrangement, defendant withdrew availability of tying product); *A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir.1986) (rather than accede to alleged tying arrangement, plaintiff purchased alternative brands); *Kingsport Motors, Inc. v. Chrysler Motors Corp.,* 644 F.2d 566 (6th Cir.1981) (plaintiff denied access to tying product after refusal to use tied product). It is less clear whether a plaintiff subject to a tie must have some interest in purchasing the tied product, i.e., whether a purchaser of the tying product is sufficiently injured merely by having to purchase an *unwanted* tied product. The Supreme Court has written that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Hyde,* 466 U.S. at 16, 104 S.Ct. at 1560. Defendants invoked this passage as indicating that Wells had no tying claim because it was not a potential "purchaser" of board memberships.

But we read the passage in question not as relevant to the issue of plain-

tiffs' injury and standing to sue, but as regarding the plaintiffs' showing as to the "not insubstantial" volume of commerce that is foreclosed by the tie. *See Barber & Ross Co. v. Lifetime Doors, Inc.,* 810 F.2d 1276, 1279 n. 1 (4th Cir.1987). Otherwise, it would be impossible to reconcile the Supreme Court's language with the clear statement earlier in the same case that invalid tying exists where the buyer is forced "into the purchase of a tied product that the buyer either did not want at all, *or* might have preferred to purchase elsewhere on different terms." 466 U.S. at 12, 104 S.Ct. at 1558 (emphasis supplied). In order to have standing, then, the plaintiff need only have been injured by the alleged anticompetitive act—it need not have been injured directly by the very anticompetitive effects sought to be remedied by the statute. The plaintiff must assert an "injury in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. This Wells has done.

■ However, Wells' action is indeed fatally affected by the excerpt from *Hyde* quoted above. Wells has failed to demonstrate the slightest market for membership in real estate boards that might have been affected by the defendants' alleged tying arrangement. There is no evidence that any other broker would have "purchased" membership in any other board but for the power exerted by the lure of the defendants' MLS. There is no evidence that a substantial volume of "commerce" in board membership was foreclosed by the tie-in.[10] The tying claim must fail absent any proof of anti-competitive effects in the market for the tied product.[11]

We are also doubtful whether this situation constitutes a "tie" of separate "prod-ucts" in the first place. We are unaware of any federal case that has characterized a multiple listing service as a tying arrangement.[12] *But see People v. National Ass'n of Realtors,* 120 Cal.App.3d 459, 174 Cal. Rptr. 728, 732–35 (1981) (applying state law tying doctrine to MLS); *People v. National Ass'n of Realtors,* 155 Cal.App.3d 578, 202 Cal.Rptr. 243, 247 (1984) (affirming trial court finding of illegal tying arrangement); *but compare People v. Colorado Springs Bd. of Realtors Inc.,* 692 P.2d 1055, 1065–67 (Colo.1984) (en banc) (no tying arrangement in MLS under state law). The defendant boards are not "sellers" in the usual sense of the term, but rather a trade organization. The MLS is one of the advantages gained by joining that trade organization. Membership brings with it certain responsibilities as well. Whether or not it is subject to challenge on other antitrust grounds, such an arrangement is not a matter of invalid tying. Indeed, we have not been alerted to any federal case in which similar requirements and incentives of such an organization have been described as a tying arrangement. We need not definitively determine whether such a characterization would ever be apt, however, because we affirm the dismissal for the reasons stated above.

## IV. DIRECTED VERDICTS IN THE COMPANION CASE

The district court directed verdicts for all of the defendant real estate boards in the 1973 case at the close of plaintiff's evidence. Plaintiff appeals three of these verdicts, those in favor of the Greater Boston, Eastern Middlesex, and Quincy/South Shore Boards of Realtors.

---

**10.** Even if we were to find that Wells had sufficiently proven the requisite volume of commerce foreclosed, there is no reason to think that the jury's verdict on the interstate commerce element of the tying claim would have differed from those it rendered on the other claims.

**11.** This is not to say that a plaintiff necessarily must prove the actual scope of anti-competitive effects in the market—the per se rule eliminates such a requirement. But the plaintiff must make some minimal showing of real or poten-tial foreclosed commerce caused by the tie, if only as a matter of practical inferential common sense. Wells' real error here was in failing to show that there was a "market" at all for real estate board membership.

**12.** Whether it is an unlawful group boycott or an illegal example of price-fixing is a much more complex question. *See United States v. Realty Multi–List, Inc.,* 629 F.2d 1351 (5th Cir. 1980).

Wells filed its complaint against these boards on June 19, 1973. The four-year statute of limitations prescribed by 15 U.S.C. § 15 limits Wells to damages sustained after June 19, 1969. Wells' sole office from 1969 onward was located in Billerica, within the provinces of the Greater Lowell Board. Wells did have offices in the Greater Boston and Eastern Middlesex areas prior to 1969, but closed them down permanently before the period applicable to this litigation. A wholly separate, though related, corporation, Wells Real Estate Of Braintree, Inc., operated an office within the jurisdiction of the Quincy/South Shore Board in the mid-sixties. It too was shut down before 1969. Mr. Livadas claims to have closed at least some of these branch offices because of the futility of competing with the allegedly illegal MLSs of the local boards. Wells sold a handful of houses in the Greater Boston and Eastern Middlesex areas after 1969, but the overwhelming preponderance of its business was concentrated in the Greater Lowell area.

We wholeheartedly agree with the trial court's dismissal of the claims against these defendants for the reasons articulated by the court. There was no evidence of a group boycott by the three boards against Wells. While it may have been futile for Wells to request access to the MLSs in those areas without agreeing to join the boards, Wells never asked for such access under any conditions. Indeed, there was some evidence that Mr. Livadas did not desire access to the MLSs—he merely wished to eliminate them. Appellant never complained to defendants, either formally or informally, about the conditions, rules, or practices attendant to the MLSs. No occasion existed for the defendants to have boycotted Wells.

The only evidence of conspiracy to monopolize seems to have been the boards' membership in the state and national associations. The district court correctly noted that this is not, in and of itself, sufficient to establish an illegal conspiracy to monopolize. *See Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 265 (D.C.Cir.1981). Unlike in the case of the 1972 defendants, there was no evidence admitted concerning commission splits, fixed commission rates, etc. The jury could not reasonably have found a conspiracy to monopolize on the basis of the scanty evidence in the record regarding these defendants. Nor could the jury have found an improper tying arrangement, for the reasons discussed in Section III, *supra.*

Neither was there any dispositive evidence regarding what Wells' damages might have been as a result of the alleged boycott and conspiracy. The jury may have been able to decide that *without* the MLSs, Wells might have cornered a greater share of the markets in the three areas in question, but the district court properly found that specific damages would have been completely speculative. Although "a private antitrust litigant is not required to prove the amount of its damages with mathematical certainty ..., this guiding principle does not shift the burden of proof and ... it is proper to indulge private antitrust plaintiffs only to the extent that there is evidence on the record from which a trier of fact could make a 'just and reasonable inference' regarding the amount of damages. If the plaintiff's proffered evidence permits no more than 'pure speculation and guesswork,' then the damage evidence is insufficient as a matter of law." *Home Placement Service, Inc. v. Providence Journal Co.,* 819 F.2d 1199, 1205 (1st Cir. 1987) (citations omitted) (quoting *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1062 (1st Cir. 1985) (in turn quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)).

The jury in this case had only Mr. Livadas' testimony that he might have continued to expand his business in those areas but for the growth of the MLSs. Wells made almost no attempt to retain any sort of market share in the areas in question. Even were we to assume that there was sufficient evidence of boycott and/or conspiracy, there is no way to draw any connection between those activities and Wells' injuries without "pure speculation and guesswork."

Finally, even if boycott and monopoly had been established by the plaintiff, there is no reason to think that the jury would have decided any differently in the 1973 case than it did in the 1972 case with regard to effect on interstate commerce. In fact, less evidence was presented regarding the scope of these defendants' activities.

## V. MISCELLANEOUS ISSUES

Appellant offers several additional arguments regarding alleged errors made by the district court on various matters of discovery and evidence. We have examined closely each of the contested decisions, and we find that the district court was well within its discretion on each of the matters in question.

Moreover, even if every one of the discovery and evidentiary rulings had been erroneous, their cumulative effect would have been immaterial. Not a single one of them, nor all of them combined, had the slightest impact on the plaintiff's failure to establish the necessary effect on interstate commerce. That issue, as we have explained above, is dispositive in this case.

## VI. CONCLUSION

For the foregoing reasons, we decline to upset the verdicts.

*Affirmed.*