Raymon TATE, Liberty Fuels, Inc., Dale Sobek, and 6000 S Corporation, Plaintiffs,

v.

PACIFIC GAS & ELECTRIC COMPANY, Defendant.

No. C 01–04015 WHA.

United States District Court, N.D. California.

Sept. 26, 2002.

Jodi Chall, Terri Mandel, Law Office of Terri Mandel, San Mateo, CA, for Raymon Tate, Liberty Fuels, Inc., Dale Sobek.

Jodi Chall, Law Office of Terri Mandel, San Mateo, CA, for 6000 S Corp.

Paul J. Riehle, Matthew A. Fischer, Michelle L. Younkin, Sedgwick Detert Moran & Arnold, San Francisco, CA, Michael D. Whelan, Stephen L. Schirle, PG&E Law Dept., San Francisco, CA, for Pacific Gas & Electric Company.

David I. Hurwitz, Stan Blemenfeld, O'Melveny & Myers LLP, Los Angeles,

CA, for Southern California Gas, San Diego Gas & Elec.

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT AND DISMISSING STATE CLAIMS

ALSUP, District Judge.

### INTRODUCTION

In this antitrust and RICO case with supplemental state claims for relief, this is the final order in a series of orders addressing the federal claims. This order **GRANTS** defendant's motion for partial summary judgment and eliminates plaintiffs' claims under the Sherman Act. The state claims held in abeyance until now are all **DISMISSED** without prejudice to refile in state court.

### STATEMENT

On October 25, 2001, plaintiffs Raymon Tate, Liberty Fuels, Inc., Dale Sobek and 6000 S Corporation filed this action. They sued nine defendants, including various utilities, their respective holding companies, a retailer of natural gas for refueling natural-gas vehicles, and a vehicle manufacturer. The only defendant now left is Pacific Gas and Electric Company, a provider of natural gas and electricity in Northern California.

The complaint included eleven claims for relief. On November 30, plaintiffs filed the first amended complaint. The same claims were reasserted. In brief, plaintiffs alleged that defendants engaged in an unlawful monopolization, restraint of trade and conspiracy to quash competition in the natural-gas vehicles industry to prevent them from successfully going to market with the Liberty Station 2000, a small-scale, natural-gas liquefier and refueling station used for dispensing liquefied natural gas (LNG) to vehicles.

On February 11, 2002, defendants moved to dismiss the first amended complaint. Since that complaint was disorganized, the Court withheld immediate ruling on the merits of the motions to dismiss, giving plaintiffs a choice of standing on their pleading or taking one more opportunity to plead their best case on the federal antitrust and RICO claims, taking into account the many arguments made to dismiss. Plaintiffs chose to amend. The state claims were held in abeyance.

On April 18, plaintiffs filed the second amended complaint. On May 8, the parties stipulated to the dismissal of all defendants without prejudice, except for PG & E, Southern California Gas Company, and San Diego Gas & Electric Company. The three utilities then collectively moved to dismiss the federal claims. On June 17, an order issued granting in part and denying in part that motion. All claims against Southern California Gas and San Diego Gas & Electric were dismissed. The second amended complaint failed to state any claim against them. Only bald and conclusory allegations were directed their way.

With respect to PG & E, the outcome was different. Well-pled facts were levied. Indulging all reasonable inferences and assuming true all well-pled facts, that order held that plaintiffs adequately pled a relevant market and monopoly power. The order eliminated, however, all alleged predation based on false grant applications for public funding and based on product disparagement. The only cognizable predation, a necessary element of a Section 2 claim, was based on alleged refusals to deal. Thus, the only antitrust claims that survived were the monopolization or attempted-monopolization claims based on alleged refusals to deal. The order stated:

> Given that PG & E dominated both the relevant downstream market and upstream utility market, it would have been predatory for PG & E to frustrate interconnections or to impose substantial conditions not imposed on others, where the intent or effect was to suppress com-

petition in the downstream market, at least where such an installation would have been permissible under the relevant utility law, the interconnection was properly requested, and no valid business justification existed for a refusal. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595–96, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Oahu Gas Serv., Inc., v. Pacific Resources, Inc.*, 838 F.2d 360, 367–68 (9th Cir.1988). Additionally, the order held that plaintiffs had failed to allege any proper RICO claims. One fatal flaw was the lapse in pleading the predicate acts of mail and wire fraud with specificity. Concurrently, another order directed discovery on the issue of gas supply, the supposed subject of the refusal to deal. The order gave priority to discovery on the federal claims. Milestones where set for the parties to complete discovery on the gas-supply issue. That completed, PG & E now moves for partial summary judgment on the remaining federal issue.

\*        \*        \*        \*        \*        \*

Now defunct and in bankruptcy, plaintiff Liberty Fuels was formed in 1998 to market and manufacture the Liberty Station 2000 and other natural-gas vehicle equipment. The Liberty Station 2000 is a small-scale, natural-gas liquefier and refueling station used for dispensing LNG to natural-gas vehicles. It is a large and mobile unit about the size of a train locomotive that connects to a dispenser that looks like an ordinary gas pump at a service station. Plaintiff Raymon Tate is the co-founder and chairman of Liberty Fuels. Plaintiff 6000 S Corporation is a real-estate management and holding company and an investor in Liberty Fuels. Plaintiff Dale Sobek is the founder and controlling shareholder of 6000 S Corporation.

The idea was that the Liberty Station 2000 could be moved to and operated at, for example, various yards servicing commercial and municipal fleets. The Liberty Station 2000 required a supply of natural gas. Specifically, the Liberty Station 2000 needed 50 pounds per-square-inch gauge ("psig") of inlet pressure to operate properly and efficiently.

Liberty Fuels contacted PG & E to obtain the necessary gas supply. To avoid repetition, the relevant facts surrounding their dealings will appear in the analysis below. Distilled to its essence, the allegation is that PG & E, anticipating its own entry into the natural-gas refueling market, refused to supply gas to Liberty Fuels as a way to destroy it before it emerged as a successful competitor.

\*        \*        \*        \*        \*        \*

With a utility monopoly over its territorial-service region in Northern California, PG & E is regulated by the California Public Utilities Commission ("CPUC"). To service its customers, PG & E imports gas through *transmission* pipelines. These transmission lines operate at pressures of 60 to over 2,100 psig. To actually deliver gas to customers' point-of-service, PG & E uses *distribution* lines. Different lines within the distribution system operate at different pressures. Certain high-pressure distribution lines operate between ten to sixty psig.

Under the requirements adopted by the CPUC, PG & E is required to install delivery facilities to provide gas service at "standard delivery pressure." Standard delivery pressure is one-quarter psig. A customer, however, may request that PG & E install "special facilities" to handle the supply of gas at pressures in excess of one-quarter psig. Where new facilities are to be installed for a customer's use as special facilities, the customer must advance to PG & E the estimated installation costs. This is the difference in costs between special facilities and standard facilities.

Since 1933, PG & E has had in place various standard practices regarding the supply of gas at high pressures. At the relevant time herein, Distribution & Customer Service Standard D–S0449, entitled "Supply of Gas at High Pressure to Customers," was in effect. It outlined the conditions under which domestic, commercial and industrial customers would be supplied with gas at other than standard delivery pressure. It stated that the maximum pressure to be delivered to customers was five psig from a distribution system operating at pressures from 25 to 60 psig. Beyond this, Standard D–S0449 stated (emphasis added):

> When the conditions set forth on Page 1 "Purpose," have been met, consideration will be given to the furnishing of high-pressure service from distribution facilities to customers, *upon request*, if:
>
> 1. The customer's equipment requires high pressure for proper operation;
> 2. It would substantially reduce the customer's expense to install or replace yard or house piping required to supply equipment at Standard Delivery Pressure, or
> 3. The Senior Gas Engineer and the Service Planning Supervisor have approved delivery at high pressure for other substantial reasons.

As stated, plaintiffs needed at least 50 psig from PG & E. Plaintiffs successfully obtained it for a previous installation in Santa Cruz after submitting the required application materials. Telephone conversations then ensued concerning two prospective alternative locations, one in San Francisco and one in San Jose, which form the basis for this action.

## ANALYSIS

### 1. LEGAL STANDARD.

Summary judgment shall be rendered if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FRCP 56(c). Summary judgment is not granted if the dispute about a material fact is "genuine" – that is, if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence, and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

"[A] moving party without the ultimate burden of persuasion at trial thus may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir.2000). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted).

### 2. THE INADEQUACY OF PROOF ON PREDATION.

■■■ As stated, where the requirements of a relevant market are satisfied, it can be predatory for a monopoly holder to impose substantial conditions on sales to a competitor not imposed on others. Put differently, the seller must deal on substantially equal terms. If the seller refuses to deal on substantially equal terms,

then the conduct can be predatory. But there must actually be conduct amounting to a *refusal* to deal on substantially equal terms. "A demand and refusal is a prerequisite to a claim of concerted refusal to deal. A plaintiff can have no relief when his failure to obtain a desired product is attributable to his own failure to make a request." *Cleary v. Nat'l Distillers and Chem. Corp.*, 505 F.2d 695, 697 (9th Cir. 1974) (citations omitted); *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 850 F.2d 803, 816 (1st Cir.1988).[1]

■ Here, the fatal gap in plaintiffs' proof is the failure to show that PG & E refused to deal. The evidence boils down to conversations over the telephone about two sites, both potential locations for the Liberty Station 2000. On this record, the most that a reasonable jury could conclude is that the brief and causal telephone calls between the two companies were preliminary discussions. They did not constitute specific requests for service. They did not amount to any refusal to supply gas. There was no letter from plaintiffs requesting supply. Nor was there any written application for supply. There was no letter wherein PG & E refused to supply gas. Nor was there any telephone call wherein PG & E refused to supply gas.

Plaintiffs have not demonstrated that it would have been futile to follow-up with a specific demand to PG & E for gas or at least a request for clarification. Here are the details.

### A. Santa Cruz Site.

The Santa Cruz story lends meaning to the critical later events. In 1998, Liberty Fuels inquired about obtaining gas service at 50 psig for its Mission Street site in Santa Cruz. Initially, PG & E told Liberty Fuels that 50 psig was not available from the closest distribution line to the proposed site. Upon further inquiries to PG & E, however, Liberty Fuels learned of another distribution line with the required psig and of a nearby transmission line (Snowden Dep. 160–61). Liberty Fuels then obtained the requisite elevated gas-pressure service from the second distribution line. To do so, Liberty Fuels completed the documents PG & E required (*id.* at 194; Lee Dep. 142). It did so in addition to paying PG & E about $18,000 to access the distribution line (Snowden Dep. 162). Having obtained the requisite service at Mission Street and another previous location, Liberty Fuels was aware of the process for obtaining elevated gas-pressure service from PG & E.[2]

1. Plaintiffs' reliance on *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), for a contrary proposition is misplaced. *Otter Tail* involved a monopolist's clear-cut refusal to sell electricity at wholesale to proposed municipal utilities. 410 U.S. at 371, 93 S.Ct. 1022. *Aspen Skiing* also involved a refusal to deal. The monopolist made an offer the competitor "could not accept" and rejected any counterproposals. 472 U.S. at 592–93, 105 S.Ct. 2847.

2. In particular, the second amended complaint admits (¶ 160):

Liberty Fuels knew how to obtain tie-in assistance to PG & E's feedstock gas lines,

having obtained access for its demonstration unit on more than one occasion. When Harold Lee obtained access to PG & E's lines and 50 pounds per-square-inch to operate the demonstration unit in July 1998 in Santa Cruz, the process was simple, informal and uncomplicated:

a. Harold Lee called PG & E's Service Planning Department on or about July 22, 1998;

b. On July 22, 1998, PG & E faxed Harold the application and option letter and asked that they be filled out and returned with a site plan;

c. On July 23, 1998 Harold faxed the one page application and the one page installation Option Selection form asking whether PG & E would do the installation or whether it would be put out for competitive bid-

## B. DeSoto Site (San Francisco).

The first controverted site was in San Francisco. In 1999, plaintiffs were considering a prospective installation at a taxi cab company in San Francisco in conjunction with the possible conversion of its fleet to LNG. The taxi cab company was DeSoto Taxi Cab Company. At a meeting on October 14, 1999, Liberty Fuels informed Norman Stone of PG & E that the Liberty Station 2000 would need 50 psig of inlet pressure at the DeSoto site (Stone Decl. ¶¶ 5–6). (Coincidentally, this occurred at a meeting wherein plaintiffs threatened to sue PG & E.) Stone encouraged Liberty Fuels to follow-up and to contact PG & E. He then assigned Efrain Ornelas, a PG & E senior program manager, to handle Liberty Fuels' service-coordination issues (*id.* at ¶ 7). On October 17, Ornelas called Liberty Fuels. He spoke with Harold Lee of Liberty Fuels to request basic information (Ornelas Decl. ¶¶ 6–7). After inquiry, he telephoned Lee a few days later. This order assumes, as it must, that plaintiffs' sworn version of the conversation is correct. During this one-to-two minute conversation, Ornelas told Lee (Lee Dep. 148–50):

> "Yes, we have high pressure lines, but on that location, we *can't guarantee that you will get more than 20 pounds per square inch.*"

In addition to informing Lee about the option of accessing a high-pressure line, Ornelas told Lee that to receive a firm estimate regarding costs would require an application and an engineering deposit (Ornelas Decl. ¶ 13).

Thereafter, another PG & E representative forwarded a cover letter and the standard package of application materials to Lee on November 18 (Zeller Decl. ¶ 10). Lee received both. In relevant part, the cover letter stated (Zeller Decl. Exh. C):

> Enclosed you will find a rather substantial package of documents that will be necessary in order to process your request for gas service at an elevated pressure. Please fill them out completely. This will expedite the process of getting your gas service installed.
>
> It is our understanding that your project will serve Liquefied Natural Gas (LNG) to the DeSoto Taxi Cab Company who is the owner of the property. If this is the case, we will also need a letter from De Soto authorizing the project.
>
> If you have any questions regarding the enclosed forms or of this process, please call me at (415) 973–9302.

Within the package were: (1) a two-page application for service for new construction, (2) a two-page service planning sheet for new construction, (3) a one-page installation option selection and (4) a one-page design selection. The remainder were reading materials (*ibid.*). Neither Lee nor anyone at Liberty Fuels ever contacted PG & E with any questions on the application materials. Nor did Liberty Fuels

ding, and asked PG & E how to express Liberty's need for 50 pounds per-square-inch minimum pressure and that they were previously receiving 55 to 60 pounds per-square-inch through a 2–inch line;

d. On July 23, 1998, PG & E sent a fax to Harold asking who was going to trench and to let them know;

e. On August 19, 1998 the application was approved and Liberty had paid the $18,000 to PG & E to obtain the service.

At oral argument, plaintiffs argued Liberty Fuels could not return the required application materials because it did not possess all the information to complete them. Be that as it may, the contention is belied by plaintiffs' admission above. Specifically, when Lee did not have the necessary information or know-how to complete the application materials for the Mission Street site, he returned the documents anyway, asking PG & E for assistance. Nothing like this happened on the DeSoto and Reed Street sites.

ever return the necessary paperwork even though it knew from past experience in obtaining elevated gas-pressure service at Santa Cruz that a completed application was necessary before PG & E could give a firm cost estimate, let alone initiate service (Zeller Dec. ¶ 12; Ornelas Decl. ¶ 13; Thomas Tate Dep. 191; Snowden Dep. 162). Plaintiffs do not dispute that they never returned the application.

Instead, plaintiffs contend that a sufficient "refusal" occurred merely because Ornelas had said PG & E could only "guarantee" 20 psig at that site and that a high-pressure line was nearby (Opp.13). Put differently, plaintiffs argue PG & E refused to deal when it failed to tell Lee that 40 psig was available at the *distribution* line and omitted specifics on a *transmission* line about 1000 feet away from the DeSoto site (Chall.Exh. 46). Plaintiffs' proffer is insufficient to create a triable issue for two reasons.

*First*, the dispute on whether Liberty Fuels was informed by PG & E of the 40 psig distribution line is immaterial. Plaintiffs needed and requested 50 psig, not 40 psig. Twenty psig versus forty psig was and remains beside the point.[3]

*Second*, plaintiffs fail to raise a triable issue on whether PG & E actually refused to convey specific information about the transmission line. Their best evidence is the testimony of Lee whose testimony about the telephone call is now quoted at length (Dep.148–50) (emphasis added):

Q. Did you have any discussion with anyone from PG & E regarding the provision of gas service to the De-Soto site in San Francisco?

A. Somebody called me on the phone, and I had a verbal conversation with them.

Q. And that was someone from PG & E?

A. Yes.

Q. Do you recall the name of that person?

A. I don't remember the name of the person. But he told me, "Yes, we have high pressure lines, but on that location, we can't guarantee that you will get more than 20 pounds per square inch."

Q. How long did that conversation last?

A. Most of my conversations with them were relatively brief.

Q. How long did your conversation that you just referred to last?

A. Maybe a minute or two.

Q. Do you recall when that conversation was?

A. It was during the time that we were preparing the site at DeSoto Cab to put a liquefier there.

Q. Did you respond to the PG & E person who told you that PG & E couldn't guarantee more than 20 pounds of pressure per square inch?

A. I couldn't figure out whether the guy just didn't know what he was talking about or whether he was kidding or what; but one way or the other, we would have trenched to the nearest 50–pound line. And this is a very commercial section of San Francisco; so there's 50 pounds out there.

Q. Did you ask this person whether he was kidding?

A. No, I didn't.

Q. Did you ask him whether he knew what he was talking about?

---

**3.** The e-mail dated June 30, 2000, from Norman Stone of PG & E is insufficient to raise a triable issue (Stone Decl. Exh. A). Clearly, on its face, the word "adaquate" [sic] was a typographical error, as Stone swore to under penalty of perjury, and the remainder of the e-mail makes clear (*id.* at ¶ 11). No reasonable jury could find otherwise.

A. No, I didn't.

Q. Did you tell him that PG & E could always provide 50 pounds of pressure per square inch?

A. I just told him, "We want 50 pounds on this site. Give us 50 pounds. Where do we have to go to get it? How far do we have to trench?"

Q. *And – and this person –*

A. *It's somewhere.*

Q. *– this person told you that there was a high pressure line available?*

A. *There is, yes.*

Q. *And – and by "high pressure line," you understood that had to mean a – a – a line that had 50 pounds of pressure; is that correct?*

A. Could be 50. Could be 150 pounds.

Q. *But more than 50?*

A. *Yes.*

Q. *50 or more?*

A. *Uh-huh.*

Q. Is that correct?

A. Yes. And I still believe that there is a high pressure line out there.

It is clear from this testimony that PG & E told Liberty Fuels about the high-pressure line. It may be that in this brief phone call PG & E was indefinite about its location. No one, however, could have reasonably expected more precision in such a preliminary call about a line about 1000 feet away. Plaintiffs point to the transcript phrase "[i]t's somewhere" and assert that PG & E lied about the location of the high-pressure line. This is very thin. To begin with, the transcript is broken up, making it hard to ascribe any meaning to the phrase. Deponent Lee interjected "[i]t's somewhere" midway

through a question. There was no follow-up by any counsel to clarify. Plaintiffs could have but failed to straighten out this problem in their opposition declarations. (While they submitted a declaration from Mr. Lee, it addressed only other points.) Placing as much weight on this scrambled passage as a jury could reasonably place, the most it shows is that PG & E was indefinite in a single and causal phone call about the location of a transmission line that turned out to be 1000 feet away. This was not a refusal to deal. *Anderson, supra,* 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for" the nonmoving party).

Plaintiffs also point to Lee's testimony, quoted above, that PG & E stated that it could "guarantee" no more than 20 psig (while also telling plaintiffs that a high-pressure line was in the vicinity). This was not a clear-cut refusal. It may well have been that while more than 20 psig was available, it could not be "guaranteed" on a consistent basis, given competing and varying load demands on the system line in question.[4] But even if this were not so (and plaintiffs show no evidence on this point), the fact is that plaintiffs admit they were not misled by this statement.

Lee stated (Dep.149–51):

Q. *Did – did you ask this PG & E person why PG & E couldn't guarantee more than 50 – 20 pounds of pressure per square inch?*

A. *No, I didn't because I didn't believe the statement.* I said, "Well, we will work around this person."

Q. And what did you do to work around that person?

4. The internal PG & E e-mails submitted by plaintiffs regarding another customer concededly treated fairly demonstrate that PG & E tried to make clear to customers requesting elevated pressures that PG & E could not, due to fluctuations, "guarantee" a constant supply of a high pressure (see note 6; Bates No. 35060).

A. By the time we put in a gas line across the – DeSoto Cab and – my – my biggest project at that time was to get the first liquefier assembled because we didn't have one completed at the time. I didn't look at this as a problem. I had a lot of very large problems to solve. *Some guy from PG & E telling me he can only give me 20 pounds was not a problem to me.*

Q. *It wasn't a problem because you didn't believe him; correct?*

A. *I didn't believe him. And I still don't.*

Q. Did you tell Mr. Tate that you didn't believe the PG & E guy who told you that –

A. I'm sure I did.

Rather than "work around" the PG & E employee, however, Liberty Fuels simply did no follow-up at all with PG & E on the DeSoto site. Even though plaintiffs did not believe the information, plaintiffs did not seek any clarification whatsoever to clear up the extent to which 50 psig could be delivered via a connection to the high-pressure line. The necessary application materials that Lee received were never returned, even though Liberty Fuels was told and knew from recent past experience that the paperwork was required before PG & E could give a firm cost estimate, let alone initiate service (Zeller Decl. ¶ 12; Ornelas Decl. ¶ 13; Thomas Tate Dep. 191; Snowden Dep. 162).

Liberty Fuels knew that a follow-up inquiry might have yielded more information on the high-pressure line. A year earlier, Liberty Fuels had obtained elevated gas-pressure service from PG & E for the Mission Street site. Of this process, the Liberty Fuels employee stated (Snowden 160–61) (emphasis added):

Q. Looking at your declaration – I just want to make sure that I have this sequence of events correct – *am I correct in understanding that you made initial inquiry as to available gas pressure for the Mission Street site and were told that the closest distribution line did not have 50 psi?*

A. *Yes.*

Q. Okay. And then after that, you made – you made some additional inquiries to find out if there were any sites that were –

A. Any.

Q. – any other sites where Liberty Fuels could obtain gas pressure near the Mission Street site – that's a terrible question. Strike that. And then after that, did – why don't you tell me what you did.

A. Okay. My recollection – and again I haven't seen the records that is there – *we did further inquiries. And there was a higher pressure line available, but it was a distance – a little bit of a distance. There was a transmission line that was available up off of Highway 1,* and that's the one I'm out – I'm – I'm going off of pure memory. Nobody has – I'm not sure on that one but – and that was physically closer, but the cost to tap into the transmission line would have been greater than the price to bring it in at a greater distance from this intermediate.

Q. Okay. So do you know whether you checked –

A. Now, I'm –

Q. – whether or not you accessed the transmission line?

A. I'm sure that we didn't access the transmission line.

In short, the most that a jury could reasonably conclude on this record is that PG

& E called Lee and, in a brief preliminary conversation, Lee obtained some information that was arguably wrong, that plaintiffs believed was wrong, and about which plaintiffs sought no clarification. These preliminary discussions never got to the point of a request for service, much less a refusal to provide service on substantially equal terms.

### C. Reed Street Site (San Jose).

Plaintiffs next inquired about elevated gas-pressure service for a site on Reed Street in San Jose. On December 6, 1999, Thomas Tate of Liberty Fuels telephoned Spence Erickson of PG & E in its San Jose division (Erickson Decl. ¶ 7). Tate asked about elevated gas-pressure service. A few days later, Erickson told Tate that PG & E could accommodate a maximum delivery pressure of 20 psig (*id.* at ¶ 10). The Tates did not believe Erickson, just as they had not believed Ornelas' information on the DeSoto site (Raymon Tate Dep. 179–81; Lee Dep. 150). Shortly thereafter, Raymon and Thomas Tate visited PG & E's mapping department to determine whether Erickson's information was true. At the mapping department, the Tates learned that the distribution line operated at 65 psig, and there was a 170–psig transmission line at an unspecified intersection on Reed Street (Raymon Tate Dep. 180). Again, they did not follow-up and ask for clarification. Again, plaintiffs did not submit the necessary application.

Nonetheless, plaintiffs contend that PG & E refused to deal in two ways. *First,* they argue that PG & E should have volunteered that a *transmission* line was located at an unspecified corner of Reed Street "nearby" the proposed site. This now turns out to have been 1400 feet away. *Second,* plaintiffs contend that the 20 psig figure PG & E conveyed was false because 50 psig or more was available via a local distribution line.

*First,* as to the transmission line, plaintiffs' proffer fails to show that PG & E refused to tell how far away the transmission line was from the Reed Street site. The best evidence plaintiffs cite is the testimony of Thomas Tate. He stated (Dep.113–15, 116) (emphasis added):

Q. So you contacted Mr. Erickson in connection with a number of sites in San Jose, and at each of those sites Mr. Erickson told you there was only 20 pounds of pressure available; correct?

A. *Correct. Yeah, he said we – they didn't have what we were asking for, and that was – that was what we were asking for. The two things was [sic] volume and pressure.*

Q. You never discussed volume with Mr. Erickson, did you?

A. Yes, I did. *On the very first time I talked to him, I had to be – explain my intent and I – like I say, we – we had an agenda we followed for the site criteria. And I told him what we needed. And I explained that one machine puts out 1,500 gallons, needed 50 pounds of pressure.* It shouldn't be a problem. We have it in both locations where we – out in – you know, right across in Santa Cruz; and so I explained the same scenario, "We need the throughput that we have in you know, just like we have in – on Mission Street."

And he – "Okay. I get it," you know; so he needed to ask somebody, you know, in the engineering, I don't know, in the mapping or whatever, whoever he talks to; and so I did. *Then after that, I got to where I need to check another location [Reed Street], and he knew – he knew what I was checking about, I was going to say, you know, pressure and volumes, and how far. You know, I want to*

*know how far the pipe was, too. Not just pressure and volume, but if it was five blocks down the street, I needed the – I needed the location. There was a couple other things, but I needed the pressure, volume location of the pipe; so I needed a fax, and – but he never gave me a description of where the pipes were.*

\* \* \* \* \* \*

Q. What volume did he say was available?

A. He just said it was – it was – he said it was – he didn't give me the volume. He didn't give me the specifics.

Q. Did you ask him what volume was available –

A. No.

This testimony simply boils down to saying that from the earlier Santa Cruz or other experiences, Liberty Fuels *assumed* that PG & E must have known what Liberty Fuels "wanted to know" and should have volunteered it in subsequent conversations relating to other sites. "Needing to know" something or "wanting to know" something is not the same as actually asking for the information. Fully credited, the testimony does not show that Liberty Fuels actually requested information on where the closest transmission line to the Reed Street site was located. It turns out to have been 1400 feet away, and it is far from obvious that any reasonable person in PG & E's position would have tracked down and volunteered the information (Morgan Decl. ¶ 11).

At all events, Liberty Fuels knew about transmission lines. It knew, from recent past experience, that further specific inquiry or submission of the required paperwork would have yielded information on how far a transmission line was located

from the proposed site (Snowden Dep. 160–61). Indeed, plaintiffs obtained this very information shortly thereafter from PG & E's mapping department (Raymon Tate Dep. 179–82). Nonetheless, plaintiffs failed to submit the required application (*id.* at 183).

*Second,* as to the distribution line, the proffer also falls short. Plaintiffs contend PG & E lied about the pressure available on the nearby distribution line, saying it could only provide 20 psig when it was really 50 psig or more (Opp.11–12). Plaintiffs call attention to two PG & E documents. The first document indicated in a stand-alone table that with different loads at 125, 200 and 600 standard cubic feet of gas per minute, the resulting pressure would respectively be 47 psig, 46 psig and 42 psig (Chall Exh. 42). This document is immaterial because an alleged refusal to inform of these exact figures – all below 50 psig – would not have made a difference one way or another. (To repeat, Liberty Fuels needed at least 50 psig.)

The second document was entitled "Gas Pressure Request Results," dated June 27, 2002. It stated that for the Reed Street site, "[t]he average pressure that is to be *expected* at the above location is between 45–50 psig according to the gas planning model, Santa Clara Industrial" (Chall Exh. 41) (emphasis added). At first blush, this arguable contradiction might suggest a fact issue on whether PG & E misled plaintiffs. PG & E's evidence, however, stands undisputed that elevated gas-pressure service *available* from distribution lines in PG & E's San Jose division was capped for sustainable-growth reasons at a maximum of 20 psig for CNG stations during 1999, the time period at issue (Erickson Decl. ¶ 5; Morgan Decl. ¶ 5; Castro ¶ 5).[5] This policy was memorialized in a

5. Specifically, before 1999 in PG & E's San Jose division, approval of requests for elevat-

ed gas-pressure service from distribution lines was limited to five psig. In 1999, that ceiling

PG & E newsletter dated September 24, 1999, before the inquiry at issue. It was authored by Spence Erickson, the same PG & E employee who spoke with Liberty Fuels on the Reed Street site. The newsletter stated (Erickson Decl. Exh. A) (emphasis added):

> *San Jose Gas Department is now providing 20 PSI as the CNG station pressure if available. Prior to this project, 5 PSI was the standard answer for San Jose/De Anza.* An inter company group is working on compiling a standard that will meet the needs of CNG station installation requiring higher pressures. *In San Jose, more work needs to be done to raise the 20 PSI cap if more pressure can be accessed.*

There was no lie and no refusal to deal.

At all events, plaintiffs knew the pressures available for Reed Street from their visit to the mapping department. Notwithstanding this information, plaintiffs did *not* go back to PG & E and clarify the supposed discrepancy. Nor did they submit the required application materials (Raymon Tate Dep. 183–85). They did not move the discussion beyond preliminary investigation.

*   *   *   *   *   *

Here, no reasonable jury could find – on this summary-judgment record – that PG & E ever refused to sell to plaintiffs. At most, the record shows preliminary telephone conversations with no follow-up to request services. Nor have plaintiffs provided sufficient evidence of futility. The Santa Cruz story demonstrates that PG & E was willing to sell gas to plaintiffs.[6]

## 3. THE ESSENTIAL–FACILITIES DOCTRINE.

In circumstances where a monopolist must share its essential facility, the elements of an antitrust claim under the essential-facilities doctrine are:

> (1) a monopolist who competes with the plaintiff controls an essential facility, (2) the plaintiff cannot duplicate that facility, (3) the monopolist denied the plaintiffs [sic] use of the facility, and (4) the monopolist could feasibly have granted the plaintiff use of the facility.

*Caribbean Broadcasting Sys. v. Cable & Wireless*, 148 F.3d 1080, 1088 (D.C.Cir. 1998); *see City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1380 (9th Cir.1992). For the reasons stated above, plaintiffs have not proffered sufficient evidence on the critical third element. No reasonable jury could find that PG & E denied them gas service.

*   *   *   *   *   *

It is true that in an antitrust case the various factual components cannot be

---

was increased to 20 psig as an exception to the overall limit of five psig. The exception was allowed to accommodate the connection of CNG stations (Maguda Decl. ¶ 21; Morgan Decl. ¶ 4–5; Erickson Decl. ¶¶ 5–6; Castro Decl. ¶ 5). One of the reasons that increasing demand led to these limits was that the San Jose area had experienced significant growth due to the high-technology industry (Maguda Decl. ¶¶ 2, 30; Morgan ¶ 10).

**6.** At oral argument, plaintiffs submitted a stack of internal PG & E e-mails regarding elevated gas-pressure service for an independent CNG company called Pinnacle CNG Systems at a site in San Jose. The earliest e-mail is dated June 15, 1998. In addition, plaintiffs submitted correspondence between Pinnacle and PG & E as well as Pinnacle's application for service. The application is dated August 12, 1998. From this, plaintiffs argue that these documents show that PG & E extended more information to Pinnacle even before it applied for service. This is an apples-and-oranges comparison. Significantly, the e-mails and correspondence demonstrate that Pinnacle was proactive in following up to obtain elevated gas-pressure service. For example, the e-mail from Spence Erickson to Teresa Duddy dated July 21, 1998, referenced that Pinnacle and PG & E set up a site meeting for August 4, 1998.

"tightly compartmentalized." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Their overall potential anti-competitive effect and intent must be assessed. The Court, however, has already taken this into account and provided plaintiffs with many benefits from this assessment, such as the presumption of a viable product market and monopoly power in that market (Order filed June 17, 2002 at 5–8). That having been done, PG & E would be answerable to monopolization offenses if it engaged in predation. The only predatory acts alleged that can possibly satisfy the Sherman Act are alleged refusals to supply gas at the requisite pressure. Accordingly, the analysis above focused on whether the evidence would support a verdict based on refusals to deal. On this, plaintiffs' proffer falls short.[7] No reasonable jury could conclude that PG & E committed federal antitrust violations.[8]

## CONCLUSION

Defendant's motion for partial summary judgment is **GRANTED.** Subject-matter jurisdiction has been sustained by the thread of the federal antitrust claims. Those claims are now DISMISSED with prejudice. In turn, plaintiffs' supplemental state claims are all **DISMISSED** without prejudice to re-file in state court. All pending evidentiary and discovery motions are *DENIED* as moot.[9] The Clerk shall CLOSE the file.

IT IS SO ORDERED.

---

7. For the benefit of the court of appeals, this order flags the curiosity that on many key points regarding the conversations between Liberty Fuels and PG & E, plaintiffs relied only on the deposition testimony of their own personnel (taken by PG & E counsel). One would have expected declarations from plaintiffs explaining the conversations. To be sure, the declarations of Raymon Tate and Harold Lee were proffered by plaintiffs. Therein, however, different points were addressed. For example, Lee's declaration was directed at the science of natural gas liquefaction and the operation of the Liberty Station 2000. At paragraph nine of Tate's declaration, he stated (¶ 9) (emphasis added):

> When PG & E told me they would only guarantee 20 psi, I knew that meant that they would place a 20–pound regulator on either the distribution or the transmission line, thereby guaranteeing no more than, or no less than, 20 psi.

Tate's statement was completely conclusory and failed to recount any who-when-where-what details. The statement, moreover, was not in accord with the deposition testimony cited by plaintiffs. The latter, for example, demonstrated that PG & E spoke to Lee and Thomas Tate regarding the DeSoto and Reed Street sites.

8. Although the operative complaint purports to allege claims for relief under Section 1, those claims are based on the same alleged refusals to supply gas. Thus, any Section 1 claim fails for the same reasons set forth above. It is unnecessary to even reach the question of whether "the Utilities" (all but one of which have been dismissed) ever reached any alleged agreement to refuse to deal with plaintiffs (Sec.Am.Compl.¶¶ 93, 160–61).

9. Specifically, this addresses defendant's motion to strike certain declarations and portions thereof that plaintiffs submitted in response to the order re discovery on gas-supply issue. This order notes that none of those objectionable declarations was relied on by plaintiffs in their opposition to the motion for partial summary judgment. Additionally, this addresses defendant's motion to strike certain portions of plaintiffs' opposition brief and declarations. None was used herein. Lastly, this addresses plaintiffs' motion to declassify all documents defendant designated as "confidential" and/or "confidential lawyers only." The hearing on the motion to declassify noticed for October 17, 2002, is vacated.